Dtjreee, Senior Judge,
delivered the opinion of the court:
The employment of plaintiff Boski, a research electronic *43 engineer in. the Naval Research Laboratory, was terminated for medical unfitness on October 17, 1969. He sues for reinstatement and for “all wages, back salaries and monies, due him as the result of his removal from his employment.” We conclude that the action of the Naval Research Laboratory in removing plaintiff from his job, and the actions of the Appeals Examining Office, the Board of Appeals and Review and the Civil Service Commission in sustaining this removal, were not arbitrary, capricious, unsupported by substantial evidence, or erroneous.
Plaintiff’s removal was pursuant to FPM 339 Section 1-3:
1-3. SEPARATION FOR MEDICAL UNFITNESS
$ $ # # &
b. General Agency Responsibility. When an employee no longer can perform the duties of his position efficiently and safely because of his physical or mental condition, the agency may separate him on the basis of disability. * * *
‡ ❖ ❖ ❖
Plaintiff had been employed by the Navy since 1965 as an electronic engineer (in GS-7 to GS-11 status) and finally reassigned on June 4, 1967, as a GS-11 research electronic engineer (instrumentation) with the Naval Research Laboratory, from which position he was removed on October 17, 1969.
On January 21, 1969, plaintiff’s immediate supervisor, Mr. R. R. Stone, wrote to the NRL’s medical officer that Mr. Roski had manifested strange behavior toward his work and his fellow workers, and requested that Mr. Roski be examined as to his fitness for duty. These conclusions are described by plaintiff as “unsupported and wild accusations,” for which he filed a complaint, alleging that the basic reason for Stone’s “discrimination in employment” against him was that plaintiff had an M.S. degree, and Stone did not.
However, Mr. Stone’s reasons for Roski’s removal were carefully and precisely stated in his three-page report of March 5, 1969. Although Roski “at first * * * exhibited by his enthusiasm and willingness an apparent high potential as a research development scientist,” this high potential was of short duration in Stone’s opinion. Stone described in detail *44 several assignments to Eoski of research development in electronics in which. Eoski failed due to “stubborn tendency toward unconventionality and unorthodox explanations,” “inability to admit any error,” “mistrust of the motives and competency of his fellow workers,” a refusal to comply with supervisory work controls and regulations, alienation from and suspicion of his “less informed” fellow workers, and an obsession that others were stealing his ideas. These conclusions by Stone, combined with his observation that records kept by plaintiff “exhibit the unorthodox and scientifically unsound approaches he has taken,” led Stone to assert that:
It is evident from his actions that he does not live in a real scientific world. The theories which he expounds cannot be endorsed by the Laboratory or even published in the scientific community without complete repudiation.
These observations as to plaintiff Eoski by his immediate supervisor were corroborated in detail by a two-page memorandum dated March 10,1969 by L. B. Wetzel, Superintendent, Communications Sciences Division NEL, who had reviewed Eoski’s work and concluded:
a. From a technical point of view, Mr. Eoski’s thought processes have become chaotic and totally ineffective. This is evidenced not only in his inability to speak rationally about the topic of his work, but in his growing insistence on introducing irrelevant abstractions (Special Eelativity, energy principles, mysterious geometric constructions, the scattering of electrons in metals, and most recently, I have been told, general relativistic notions of curved space) into what is essentially a straightforward engineering problem.
b. There is no substance in Mr. Eoski’s accusations against Mr. Stone. In fact, from conversations with people in Mr. Stone’s section, and with Mr. Stone himself, I am convinced that Mr. Stone was extremely fair and lenient with Mr. Eoski, who was given the benefit of every doubt which arose during the course of his work.
Mr. Don I. Himes, Stone’s immediate supervisor, also reported difficulties and concern with plaintiff’s work and his explanations. This was done in response to plaintiff Eoski’s *45 request to Himes to review his work in May 1969. Concerning this review, Himes stated:
* * Hi ❖ *
Mr. Eoski presented his experimental results and theories in an increasingly disjointed manner. Although these theories and the results he has obtained do not conform to accepted practice or objective analysis, this factor is not the primary cause for the concern engendered in the writer by this interview. Eather, it became apparent that Mr. Eoski demonstrates an alarming singleness of purpose in ascribing mystical properties to the devices he has developed. His almost animistic explanations could be understood if the individual were ignorant or untrained. On the contrary, Mr. Eoski demonstrated to the writer’s satisfaction a deliberate avoidance of reality (explaining to some degree the disjointedness mentioned earlier) by changing the thrust of the discussion whenever logical continuation would lead to a confrontation between his work and conventional, scientific explanation. This behavior reinforced the conclusion that Mr. Eoski chose to ignore (as opposed to being unable to understand) rational procedures or established relationships.
There is also substantial evidence from these supervisory employees as to plaintiff’s lack of productivity, failure to perform in accordance with his grade and position, resultant economic loss to the Laboratory, and its being prevented from having someone else do work already assigned to plaintiff.
Upon request by Mr. Stone, Dr. Lieberman, the Medical Officer at NEL, after further investigation on March 6,1969, recommended psychiatric testing of plaintiff to determine his fitness for duty.
Plaintiff was advised of his right to submit a list of certified psychiatrists from which one would be selected for the psychiatric examination. Plaintiff chose Dr. Eandolph Frank, who was then sent a letter with background information on Mr. Eoski by Dr. Lieberman in requesting a medical diagnosis and prognosis. Dr. Lieberman also sent to plaintiff’s attorney an explanation of the behavior of plaintiff which had caused the NEL concern as to his fitness to perform his work, concluding in substance that his thought processes “are chaotic, irrational and totally ineffective,” *46 that he “is manifesting behavior highly suspicious of Paranoid Schizophrenia.”
In April 1969 Roski consulted a private clinical psychologist, Ruth Lunn, who found him not unfit for duty, but needing psychotherapy and that “he should not for his own good continue working in his present situation” and that he was “manifesting more of the latent schizophrenic symptoms at this time.” She did later state that she was qualified to comment only on Roski’s “social behavior, not his ability to do scientific work,” and she saw him more as “a borderline schizophrenic with obsessive compulsive defenses * *
On May 5,1969, Dr. Frank, plaintiff’s choice as a psychiatrist, recommended “that subject would be fit for duty emotionally at the Naval Research Laboratory with voluntary psychotherapy and in a structured job preferably with a minimum of security and a maximum of supervision.” Subsequently he confirmed his diagnosis of “schizophrenic reaction, paranoid type” and further stated “the prognosis, without meaningful psychotherapy, is considered to be quite guarded.”
There is a dispute in the evidence as to whether plaintiff was ever offered a “structured job” by the NRL, as recommended by Dr. Frank. However, on October 14, 1969 Alan Berman, Director of Research at the NRL, advised plaintiff that “a structured job with a minimum of security and a maximum of supervision” had been provided, but that plaintiff’s job performance did not improve; that in a further attempt to aid plaintiff, he was given a new assignment under the supervision of Mr. Himes, but that his performance in this new position was “less than satisfactory.”
This letter of October 14,1969 from the NRL Director of Research also concluded that plaintiff was medically unfit for employment and advised plaintiff that he would be removed, effective October 17,1969. The reasons for this action are fully given in this letter, and plaintiff was also fully advised of his rights of appeal and the procedures required therefor.
Several months after plaintiff’s removal, a further statement from Dr. Frank, dated August 1970, was filed by plaintiff with the Civil Service Commission Board of Appeals *47 and Eeview, which also repudiated his earlier unfavorable findings as to plaintiff:
During my evaluation of Mr. Eoski during the month of August, 1970, I related to him that, after reading a truthful account of events that occurred at the Naval Eesearch Laboratory during his stay there, I do not think that he needed a structured job then, in contradiction to my report of an earlier date.
Evaluations of his work by more competent people indicate that he was a productive employee. Thus, the laboratory personnel misinformed me and caused me to diagnose him incorrectly.
There is no evidence as to identity of these “more competent people” whose favorable evaluation of plaintiff’s work caused Dr. Frank to change his opinion in August 1970, or how they were in a better position to evaluate plaintiff’s work than his own work supervisors Stone, Himes and Wetzel, who specified in detail their reasons for concluding he was unfit for duty.
The Board of Appeals and Eeview concluded that “Doctor Frank’s subsequent repudiation under date of ‘August 1970’ of his medical findings unfavorable to Mr. Eoski does not indicate that his dismissal on the facts before the agency at the time was erroneous, and therefore does not provide a basis for disapproving the adverse action.”
On December 14,1970, Dr. Frank stated in writing further reasons for the repudiation of his original diagnosis that Eoski “needed a structured job and was therefore medically unfit for duty at that time”:
iji sj: íJí ifc
It was not until the summer of 1970 when Mr. Eoski returned to my office that I was first made aware of the evidence in support of Mr. Eoski’s medical fitness for duty; namely, the formal hearing of May 12, 1970, the erroneous nature of Naval Eesearch Laboratory letter dated 11 April 1969, and Dr. Cavender’s report stating that Mr. Eoski has a compulsive personality and is fit for duty.
I subsequently signed the statement of August, 1970, stating that Mr. Eoski never needed a structured job and therefore was never medically unfit for duty.
*48 After Roski’s removal by NRL on 'October 17, 1969, and bis appeal to the Civil Service Commission, Roski submitted reports from three different doctors whom he consulted who found that his symptoms were “more of a neurotic nature, of an idiosyncratic nature,” “no disorder in thinking” and problems that needed “continuing psychotherapy.” All of these reports were given after Roski had already been given psychotherapy and after his removal.
The written decision of the Director of Research at the NRL, Alan Berman, states in considerable detail his analysis of the evidence upon which he concluded that Roski was “medically unfit for employment at the present time” and directed his removal on October 17, 1969. The Appeals Examining Office of the Civil Service Commission also reviewed the evidence in great detail in affirming Roski’s removal by the NRL on July 1, 1970, as did the Commission’s Board of Appeals and Review in its decision of November 17, 1970. The Civil Service Commission on May 20, 1971, refused to reopen or reconsider the decision of the Board of Appeals and Review after full consideration of all matters submitted to it.
Upon the present appeal, we are confronted with a highly involved and contradictory welter of expert psychiatric opinion as to plaintiff’s mental condition. We conclude, after careful examination of tins evidence, and that of plaintiff’s immediate supervisors as to his personal actions during his employment by the NRL, that the decision by the NRL in directing Rosld’s removal, and the affirmation thereof by the Appeals Examining Board, the Board of Appeals and Review, and the Civil Service Commissioners, was not arbitrary or capricious, and is supported by substantial evidence.
We are mindful of the regulations cited by plaintiff in support of his contention that the NRL failed and refused to protect plaintiff’s rights before starting removal action.[1] This claim was not brought before the Civil Service Commission, and may not be raised in this court for the first time. Haynes v. United States, 190 Ct. Cl. 9, 418 F. 2d 1380 (1969). There is, in any event, no basis for plaintiff’s claim. The regulations require every reasonable effort to reassign the *49 employee to duties he can perform efficiently and safely. However, these regulations do not require that plaintiff be reassigned on-the-job psychotherapy in a new position in scientific research, somehow structured for their remedial mental purposes for an indefinite period, merely because this was recommended by psychiatrists. The record does establish that the NRL went to great length and effort to help plaintiff before taking its removal action, by a change in supervisors against whom he alleged prejudice and discrimination, by providing for examination by a psychiatrist of plaintiff’s own choice, and by carefully considering the conclusions of his own psychologist, Miss Lunn, as to his need for continued psychotherapy “as a borderline schizophrenic with obsessive compulsive defenses.”
Plaintiff also claims that several other procedural irregularities occurred during the removal action and appeal:
1. That the letter proposing removal lacked the specificity required by FPM 752, Sec. 2-2. The purpose of this section is to require the employing agency to provide the employee with enough notice so that the notice is meaningful — i.e., so that he can prepare himself to counter the charges made and set up a defense to the proposed action. The letter of removal sets forth the reasons for removal, a detailed discussion of the medical evidence as to plaintiff’s medical unfitness for employment as evidenced by supporting statements as to his deficiencies in performance and problems with his intra-office relationships. The great detail into which plaintiff went in his defense to the notice of removal further establishes his knowledge of the exact reasons for his separation.
2. Plaintiff now asserts for the first time that the proper procedure for oral reply was not given, and that bona fide consideration was not given to his oral reply. Since this claim was not raised before the Civil Service Commission, plaintiff has failed to exhaust his administrative remedy before bringing his action in this court. Haynes v. United States, supra.
3. Plaintiff claims that the agency’s final letter of adverse action failed to state which of the reasons in the notice of proposed adverse action were sustained, and which were not. This issue was also not raised before the Civil Service Commission, and is likewise precluded now. Haynes v. United States, supra.
*50 4. Plaintiff claims that the Appeals Examining Officer of the Civil Service Commission (AEO) failed to protect his rights before the hearing in that the evidence presented to the AEO by the NBL was not made available to him, and that he was not permitted to call W. Berg as a witness at the hearing. The record shows that any failure to get information and to call witnesses was plaintiff’s fault, and not the fault of the AEO. Plaintiff’s counsel was made aware by letter of April 7, 1970 of additional submission to the case file and that the file had been made available for review by both parties. Further, by notice of April 17, 1970 scheduling the hearing, plaintiff’s counsel was advised that it was the privilege of both parties to review the Commissioner’s file prior to the hearing. As to plaintiff’s claim that he was not permitted to call W. Berg as a witness, the record indicates that plaintiff withdrew the name of W. Berg as a requested witness even though the NBL stated it would interpose no objection to his testifying. It was plaintiff’s burden to produce witnesses if he desired their presence and testimony. Williams v. Zuckert, 372 U.S. 765 (1963).
5. Plaintiff asserts violation of due process when the Hearing Examiner exhibited bias against plaintiff. We find no weight of evidence to support this conclusion. The presumption in such cases is that the Government officials acted in good faith, in the absence of evidence to the contrary. Grover v. United States, 200 Ct. Cl. 337 (1973). Furthermore, plaintiff did not raise this issue before the Board of Appeals and Beview, and has therefore failed to exhaust his administrative remedies on this point. Haynes v. United States, supra.
6. Finally, plaintiff claims that his due process rights were violated when the AEO permitted the Commission’s physician to submit an adverse advisory medical opinion against him without examining him, and without such physicians being subject to examination by plaintiff. Plaintiff’s claims are unwarranted in that the Regulations and caselaw support the right of advisory opinions from CSC medical officers to aid in agency medical determinations. 5 CFR § 772.306(a) (1970); Richardson v. Perales, 402 U.S. 389 (1971).

Conclusion

The action of the NBL in removing plaintiff because of medical unfitness was not arbitrary, capricious, or unsupported by the evidence; the AEO, the Board of Appeals and *51 Review and the Commissioners did not act arbitrarily and capriciously in sustaining the removal.
Plaintiff cannot succeed in reversing the decision because of claimed procedural defects, which are unwarranted, or not raised before the Civil Service Commission.
Defendant’s motion for summary judgment should be granted, plaintiff’s motion for summary judgment denied, and the petition dismissed.

 NCPI 352.1-7, FPM 339, Sec. 1-3 (1969).