**Grace K. McFARLAND**

v.

**The UNITED STATES.**

No. 746–71.

United States Court of Claims.

May 14, 1975.

John I. Heise, Jr., Silver Spring, Md., atty. of record, for plaintiff. Heise & Jorgensen, Silver Spring, Md., of counsel.

Raymond B. Benzinger, Washington, D. C., with whom was Acting Asst. Atty. Gen., Irving Jaffe, for defendant.

Before SKELTON, KASHIWA and KUNZIG, *Judges.*

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision filed April 25, 1974, by Trial Judge Harry E. Wood pursuant to Rule 134(h). The court has considered the case on the briefs and oral argument of counsel. Since the court agrees with the trial judge's recommended decision, with modifications by the court, as hereinafter set forth,* it hereby affirms and adopts the same, as modified, as the basis for its judgment in this case.†

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed April 25, 1974, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

WOOD, *Trial Judge:*

In this action, plaintiff sues to recover "back salary", less appropriate offsets, from and after June 12, 1968, on the ground that her involuntary retirement for physical disability from her position as an accounting technician, GS–5, at Patrick Air Force Base, Florida, effective June 11, 1968, was unlawful.

Plaintiff contends (1) that the agency application for plaintiff's disability retirement, and a psychiatric evaluation subsequent to the said application, but prior to action by the Civil Service Commission on the agency application, "constitute error which went to the very heart of the administrative determination of disability", and (2) that both the Civil Service Commission's "refusal to overturn its original determination" and its refusal to grant plaintiff a hearing in connection with her efforts to obtain reversal of the Commission's original determination, are arbitrary and erroneous.

Defendant urges that there is no basis for setting aside the Commission's determination that plaintiff was totally disabled for useful and efficient service in her position, and that, its defense of this action having been prejudiced by plaintiff's delay in commencing suit in this court, her claim is in any event barred by the doctrine of laches.

For reasons hereinafter set forth, and without reaching the question of laches, it is concluded that defendant's position on the merits is valid. Accordingly, plaintiff is not entitled to recover.

Plaintiff's employment at Patrick Air Force Base ("AFB") began in 1951. In 1958 she was separated by adverse action from her position as an accounting tech-

† The concurring opinion of Skelton, *Judge,* follows the opinion of the trial judge which has been adopted by the court.

nician, GS–6, for inefficiency. On appeal, the separation was cancelled as procedurally defective, and she was restored to duty retroactively. Shortly thereafter, however, she was downgraded from GS–6 to GS–5 pursuant to a reduction-in-force.

Insofar as the present record shows, plaintiff's employment at Patrick AFB from 1958 to mid-1966 was not only satisfactory but seemingly not particularly eventful. The sole recorded incident concerning her during this period occurred in November 1964, when plaintiff's request for authorization to work overtime was denied by her then supervisor, Mr. Clark. She became upset and began to cry, and, according to the supervisor, created a scene.[1] It is clear from the record, however, that throughout her employment at Patrick AFB plaintiff felt she was being intimidated, persecuted, and subjected to "harassing pressures" by her superiors at Patrick AFB.

Early in 1966, responsibility for aviation fuels accounting, for some 4 years prior thereto a substantial part of plaintiff's duties as an accounting technician, GS–6, was transferred to another office. Plaintiff was not assigned any duties to replace those transferred, and her complaints about the loss of duties met with no success.

In June 1966, plaintiff's office (and plaintiff) came under the supervision of Mr. Lopez-Vega, theretofore a GS–9 at the Air Force Accounting and Finance Center. Plaintiff felt that she was qualified for, and should have been promoted to, the GS–7 supervisory position given to the new supervisor, and it is fair to conclude that she was resentful of both the appointment and the appointee.

Prior to his arrival at Patrick AFB, Mr. Lopez-Vega had been told by the Chief, Accounting and Finance Branch, Patrick AFB, that if he accepted the GS–7 position there he would be working with plaintiff, and that she would be very difficult to deal with. At Mr. Lopez-Vega's initial introduction to plaintiff, she made no response whatever to his greeting to her, and in his opinion the initial meeting was very unpleasant. Thereafter, whenever he had a problem or a conflict with her, he made a memorandum for the record describing the incident.

Between June 12, 1966 and September 12, 1966, Mr. Lopez-Vega recorded five incidents concerning plaintiff: in general terms, her failure or refusal to carry out his instructions on June 17, August 1, and August 12, 1966; her use of hostile and insulting language to a fellow worker on June 29, 1966; and, on September 8, 1966, her refusal to comply with his written instructions, coupled with her subsequent use of a vulgar word which created a very unpleasant situation in the office. There is no doubt that the several incidents just mentioned in fact occurred substantially as described.

In October 1966, plaintiff was reprimanded for failure to carry out her assigned duties in a reasonable period of time on August 12, 1966, and for disorderly conduct on September 8, 1966. In the meantime, effective September 12, 1966 (after a downgrading as a result of a position survey to accounting technician, GS–5, with saved pay for 2 years), she had been transferred to another section, where she again came under the administrative supervision of Mr. Clark. From September 12, 1966 to February 2, 1967, there was no recorded incident of plaintiff's attitude or conduct in her new position.

On the morning of February 2, 1967, plaintiff and her technical supervisor, a Miss Grice, engaged in a rather emotional exchange over plaintiff's mailing, contrary to Miss Grice's instructions, of an original, rather than a duplicate, of a report. During the course of the exchange, Miss Grice slammed a posting ledger on the desk in front of plaintiff. Plaintiff went to Mr. Clark about the

1. Mr. Clark noted the incident on a Patrick AFB form used by supervisors for annotating some discussions with employees, plaintiff

went to higher authority with her request, and ultimately received the authorization she sought.

incident, stating that she was being blamed for everything and asking when she was going to get out of the section. During the discussion with Mr. Clark, plaintiff began to cry and became very upset. Mr. Clark made a record of the incident, and reported it to the Chief, Accounting and Finance Branch.

Shortly thereafter, "by reason of your disruptive job behavior which has continued over the past 3 years", the Chief, Accounting and Finance Branch, directed plaintiff to report to Patrick AFB Hospital for a medical examination to determine whether she was physically able to continue in her assigned tasks. The report of that examination, conducted February 20, 1967, by an Air Force medical officer, reflected that plaintiff's emotional and mental stability were poor, and contained a recommendation for "psychiatric workup for existing personality disorder."

By letter dated March 16, 1967, plaintiff was informed by the Chief, Accounting and Finance Branch, of an appointment March 23, 1967, with Dr. Edward J. Adickes, of Indialantic, Florida, near Patrick AFB. Plaintiff was advised that government transportation to Dr. Adickes' office had been arranged for her, and that if she refused to be examined or to have the results reported, she might be separated for that reason.

Dr. Adickes' March 24, 1967 report to the Civilian Personnel Office, Patrick AFB, of his psychiatric evaluation of plaintiff reflected the opinion that she evidenced marked difficulties in judgment when dealing with highly charged emotional material, and inappropriate and hostile attitudes. He concluded that plaintiff "has a persecution complex with paranoid delusions prominent enough to create difficulty in maintaining reasonable behavior." [2]

On April 6, 1967, Mr. Clark signed a Standard Form 2801–A, "Superior Officer's Statement In Connection With Application For Total Disability Retirement." Among other things, the said statement reflected that periodically plaintiff's "tantrums and emotional upsets disrupted the office." Under the heading of "instances of emotional instability or abnormal behavior", Mr. Clark listed the November 1964 incident involving plaintiff and Mr. Clark, each of the five June-September 1966 incidents described above, and the February 1967 incident involving plaintiff and Mr. Clark.

On April 19, 1967, plaintiff was afforded an opportunity to apply for disability retirement, but emphatically declined to do so. On April 20, 1967, an agency application for her disability retirement, accompanied by Standard Form 2801–A, the report of plaintiff's February 20, 1967, examination at Patrick AFB Hospital, Dr. Adickes' March 24, 1967, report, and a statement that plaintiff refused to execute an application for disability retirement were transmitted to the Atlanta Region, Civil Service Commission ("CSC").

At the request of the Regional Medical Officer, Atlanta Region, CSC, plaintiff was seen by Dr. James R. Parsons, of Melbourne, Florida, also near Patrick AFB, on May 25, 1967. Dr. Parsons had never seen plaintiff prior to that date, but he had received from Patrick AFB, and had read, a copy of Dr. Adickes' March 24, 1967, report concerning her. Dr. Parsons' understanding in 1967 was that only one appointment for plaintiff with him in connection with his evaluation of her was possible.

By letter dated June 15, 1967, to the Regional Medical Officer, Atlanta Region, CSC, Dr. Parsons reported plaintiff's sudden loss of courtesy and composure within less than 5 minutes, and her demonstration of "a very marked 'push of speech' * * * interrupted by flashes of intense hostility in her eyes, followed by inappropriate smiling, when tears would well up and almost overflow." He felt that on some level of consciousness plaintiff knew she was very ill, stated that he hoped she would

---

2. Dr. Adickes died well prior to trial of this cause.

be able to receive treatment, and made a diagnosis of "Schizophrenic Reaction, Paranoid Type, With Depressive Trend."

In due course the agency application and supporting documentation reached the Bureau of Retirement and Insurance, CSC, Washington, D. C., and on July 20, 1967, plaintiff was notified that it had been determined that she should be retired for disability, and was advised of her right of appeal.

In August 1967, plaintiff transmitted to the Bureau of Retirement and Insurance the opinion of Dr. William H. Geiger, a private psychiatrist who had examined her August 10, 1967. Dr. Geiger's impression was, in substance, that plaintiff was intelligent, with no evidence of organic brain damage or major mental illness. Treating plaintiff's correspondence as an appeal, the Medical Division, CSC, forwarded the matter to the Board of Appeals and Review ("BAR"). By decision dated October 31, 1967, the BAR, after referring to the medical evidence in the record, including Dr. Geiger's opinion, upheld the determination of the Bureau of Retirement and Insurance. In consequence, plaintiff's disability retirement became effective June 11, 1968.

Thereafter, plaintiff (and others on her behalf) began an extensive series of correspondence with the Commission, as detailed in the findings. Among other things, plaintiff sought, obtained, and submitted to the Commission from time to time, reports from psychiatrists and psychologists who had examined her, and in January 1969, she requested, as she had prior thereto, that she be afforded a hearing.

The 1969 request for hearing followed a second visit, on September 23, 1968, to Dr. Parsons. During this visit, lasting approximately 45 minutes, plaintiff presented to Dr. Parsons letters she had obtained from Dr. Geiger and other doctors following May 1967.

By letter dated September 24, 1968, to the Commission, Dr. Parsons stated that he felt that his earlier impression of plaintiff was "not consistent with her present appearance, as well as the fact that she has been able to impress other psychiatrists favorably", and that following plaintiff's 1967 appointment with him he had instructed his secretary to refuse further "single-visit-evaluations" since such evaluations were "not fair to either patient or psychiatrist." Dr. Parsons concluded that:

> In retrospect, I feel that [plaintiff] was under a strain of presenting a tremendous amount of information to me in a very limited time, so that she appeared much more disorganized than she actually is. Again, that single interview was not entirely equitable; I see no reason why [plaintiff's] appeal should not be considered favorably.

Then and on several occasions thereafter, however, the Commission has consistently adhered to its determination that allowance of the agency's application for plaintiff's disability retirement was warranted. Nor was plaintiff ever afforded a hearing by the Commission.

In the 1966 codification of Title 5, United States Code, Congress provided that any federal employee "who completes 5 years of civilian service and is found by the Civil Service Commission to have become disabled shall be retired on his own application or on application by his agency", that the Commission should "determine questions of disability and dependency arising under this subchapter", and that "The decisions of the Commission concerning these matters are final and conclusive and not subject to review." 5 U.S.C. §§ 8337, 8347(c) (1970).

In *Scroggins* v. *United States*, 397 F.2d 295, 297, 184 Ct.Cl. 530, 533–34, *cert. denied*, 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968), this court held that the latter provision

> * * * is a special and unusual restriction on judicial examination, and under it courts are not as free to review Commission retirement decisions as they would be if the "finality" clause were not there. * * * at best, a court can set aside the Commission's determination "only where there

has been a substantial departure from important procedural rights, a misconstruction of the governing legislation, or some like error 'going to the heart of the administrative determination.'" *Gaines v. United States,* 158 Ct.Cl. 497, 502, *cert. denied,* 371 U.S. 936, 83 S.Ct. 309, 9 L.Ed.2d 271 (1962). * * *

See also *Lech v. United States,* 409 F.2d 252, 187 Ct.Cl. 471 (1969); *McGlasson v. United States,* 397 F.2d 303, 184 Ct.Cl. 542 (1968); *Kleinfelter v. United States,* 318 F.2d 929, 162 Ct.Cl. 88 (1963).

One of plaintiff's arguments is that the actions of officials at Patrick AFB in preparing an application for disability retirement constituted vitiating error. Focusing upon the Standard Form 2801–A prepared concerning plaintiff, she vigorously urges that Patrick AFB officials overzealously magnified "isolated confrontations between plaintiff and her supervisors * * * out of all proportion * * *", that she was neither emotionally unstable nor a disruptive influence in her office and that "The events do not support the conclusion which the Agency drew."

 The presumption that government officials have acted in good faith in making a decision can be overcome only by a strong showing to the contrary. *Roski v. United States,* 204 Ct.Cl. 40 (1974); *Grover v. United States,* 200 Ct.Cl. 337, 343–44 (1973). There is no room for doubt that the incidents listed by Mr. Clark in the Standard Form 2801–A occurred, nor is there any persuasive proof in this record of distortion, magnification, or improper motivation by any agency official in connection with Standard Form 2801–A. While there is room for doubt that agency action in preparing the application is of any relevance here, it is in any event clear that the presumption of good faith has not been overcome. *Lech v. United States, supra; McGlasson v. United States, supra.*

Moreover, the incidents listed in the Standard Form 2801–A were not the sole basis for the agency's April 20, 1967, decision to apply for plaintiff's involuntary retirement for physical disability, as plaintiff seems to suggest. That decision followed, and rested in large part upon, a February 20, 1967, report of medical examination at Patrick AFB Hospital, stating that plaintiff needed a psychiatric workup for an existing mental disorder, and Dr. Adickes' March 24, 1967, psychiatric report, stating that plaintiff had a persecution complex with prominent paranoid delusions.

If, as plaintiff asserts, she might properly have been subjected to disciplinary action in consequence of the incidents listed in Standard Form 2801–A, the actual agency decision in April 1967 to apply for plaintiff's involuntary retirement plainly affords no basis for granting any relief here. *Scroggins v. United States, supra; McGlasson v. United States, supra; Gaines v. United States,* 158 Ct.Cl. 497, *cert. denied,* 371 U.S. 936, 83 S.Ct. 309, 9 L.Ed.2d 271 (1962).

Plaintiff also contends that Dr. Parsons' original evaluation of plaintiff, in May 1967, was unfair, improper, and inaccurate, that "once Dr. Parsons determined that his evaluation of plaintiff was inaccurate and improper, then there was an error which went to the very heart of the administrative determination", and that when Dr. Parsons "repudiated his position and announced that he was wrong, the refusal [of the Commission] to overturn its original determination was arbitrary."

 Dr. Parsons' September 1968 report to the Commission concerning plaintiff was made, as was his June 1967 report, after seeing her for about 45 minutes. His only other contact with plaintiff between the two reports was very brief. On careful reading, Dr. Parsons' September 1968 report reflected clearly his opinion that a "single-visit-evaluation" was inherently unfair, and that plaintiff's "present appearance" was not consistent with his earlier impression of her, but the argument that he "repudiated his position and announced that he was wrong", then or in later presenta-

tions to the Commission, is not entirely accurate. That aside, however, plaintiff's position is not a tenable one.

■ The duty of determining questions of disability is imposed by statute on the Commission, and only some error "going to the heart of the administrative determination", as defined in *Scroggins* v. *United States, supra,* permits the setting aside by a court of the administrative discharge of that duty. Even repudiation of a medical evaluation adverse to an employee would not inexorably lead to such action. *Cf. Roski* v. *United States, supra.*

■ Dr. Adickes' psychiatric evaluation of plaintiff, which he refused to reconsider, was adverse to her. Dr. Parsons did reconsider, and at least at trial, he did testify that his first opinion was definitely inaccurate. In any event, the Commission had before it a mass of medical evidence, as detailed in the findings, concerning plaintiff. In March 1971, and again on April 1, 1971, the Commission reviewed all of the medical evidence before it. On both occasions it concluded that reopening its previous decision was unwarranted. "There is plainly no error going to the 'heart of the administrative determination' when the Commission accepts one medical view rather than another." *Scroggins* v. *United States, supra,* 397 F.2d at 300, 184 Ct.Cl. at 537; see also *McGlasson* v. *United States, supra; Gaines* v. *United States, supra; cf. Roski* v. *United States, supra.*

In her main brief, filed herein April 9, 1973, plaintiff conceded that she was not entitled, under Commission regulations, to a hearing "in the first instance", but asserted that the Commission's failure to grant her request for a hearing after Dr. Parsons' 1968 letter to the Commission was arbitrary.

■ Putting considerations of due process aside for the moment, the Commission was under no legal obligation to grant plaintiff a hearing in connection with the application for her retirement, nor, "even though that course might have been wiser or more advisable", was it under any legal obligation to do so in connection with her repeated requests for reconsideration. *Scroggins* v. *United States, supra,* 397 F.2d at 298, 184 Ct.Cl. at 535. Indeed, plaintiff's argument in this connection is, on analysis, really no more than that the circumstances warranted a hearing, and that the Commission had authority to hold one.

In plaintiff's reply brief, however, a right to a "due process hearing *before* the termination of her rights as a Civil Service employee and her discharge from public employment" is asserted. For this proposition, plaintiff cites *Board of Regents* v. *Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Morrissey* v. *Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Goldberg* v. *Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); and *Kennedy* v. *Sanchez,* 349 F.Supp. 863 (N.D.Ill.1972), *prob. juris. noted sub nom., Phillips* v. *Kennedy,* 411 U.S. 915, 93 S.Ct. 1549, 36 L.Ed.2d 306 (1973) (*rev'd sub nom., Arnett* v. *Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).[3] While this claim of constitutional right is plainly inconsistent with plaintiff's earlier concession, it is nonetheless now to be considered. See *Scroggins* v. *United States, supra,* 397 F.2d at 298, n. 4, 184 Ct.Cl. at 534, n. 4; *cf. Roski* v. *United States, supra; Haynes* v. *United States,* 418 F.2d 1380, 190 Ct.Cl. 9 (1969).

■ It is clear that the range of interests protected by procedural due process is not infinite. *Board of Regents* v. *Roth, supra,* 408 U.S. at 570, 92 S.Ct. 2701; *cf. Sampson* v. *Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). And in light of *Arnett* v. *Kennedy, supra,* it is equally clear that plaintiff's claim of constitutional right to a hearing prior to her disability retirement is invalid.

While plaintiff has not urged a constitutional right to a due process hearing

---

3. Plaintiff's Reply Brief was filed herein November 15, 1973, some months prior to the decision in *Arnett* v. *Kennedy, supra.*

following her disability retirement, the several opinions in *Arnett* v. *Kennedy, supra,* strongly suggest that this aspect of the matter too should be considered and decided.

In *Scroggins* v. *United States, supra,* plaintiff asserted both a statutory and a constitutional right to a "trial-type hearing (or the prime elements of one) * * * *" in connection with her involuntary retirement for disability. The court, observing that it and other courts had "already declared otherwise", saw "no adequate reason to depart at this time from that unanimous position."

Neither *Arnett* v. *Kennedy, supra,* nor any of the cases cited in plaintiff's reply brief, involved the disability retirement of a federal employee.[4] As late as December 1973, the court held that the involuntary retirement for physical disability, without prior hearing, of a hearing examiner was invalid on statutory, not constitutional, grounds. *Benton* v. *United States,* 488 F.2d 1017, 203 Ct.Cl. 263 (1973). In light of the nature of this case, the decisions of this court in *Scroggins* and *Benton,* and the absence of any authority contradicting the "unanimous position" taken by this and other courts on this issue, no denial of plaintiff's constitutional rights can be perceived.

Furthermore, in *Arnett* v. *Kennedy, supra,* 416 U.S. at 178–179, 94 S.Ct. at 1656, with relation to the requirement of a hearing at "some time," Justice White stated as follows:

* * * Where the Court has rejected the need for a hearing prior to the initial "taking," a principal rationale has been that a hearing would be provided before the taking became final. See *North American Cold Storage Co.* v. *Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (seizure of food unfit for consumption); *Cen-*

*tral Trust Co.* v. *Garvan,* 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403 (1921) (seizure of property under Trading with the Enemy Act); *Corn Exchange Bank* v. *Coler,* 280 U.S. 218, 50 S.Ct. 94, 74 L.Ed. 378 (1930) (seizure of assets of an absconding husband); *Phillips* v. *Commissioner of Internal Revenue,* 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931) (collection of a tax); *Bowles* v. *Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944) (setting of price regulations); *Fahey* v. *Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947) (appointment of conservator of assets of savings and loan association); *Ewing* v. *Mytinger & Casselberry,* 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (seizure of misbranded articles in commerce). While these cases indicate that the particular interests involved might not have demanded a hearing immediately, they also reaffirm the principle that property may not be taken without a hearing at some time.

■ In *Phillips* v. *Commissioner of Internal Revenue, supra,* a tax case, the hearings mentioned in the case include hearings in courts; in *Central Trust Co.* v. *Garvan, supra,* a trading with the enemy case, the hearing referred to is also that in the courts after the taking. An examination of the other cases cited indicates that they contemplate a later court review. In other words, the due process requirement is met where a later court proceeding is allowed. In the present case, plaintiff was afforded a full hearing before the trial judge of this court. The hearing lasted two days. The transcript of testimony covers 436 pages, and 13 witnesses were heard with full right of cross examination given plaintiff. Plaintiff herself testified. Plaintiff's complaint that there was no hearing is

---

4. Justice White in *Arnett* v. *Kennedy, supra,* states 416 U.S. at page 186, 94 S.Ct. at page 1660:

"A different case might be put, of course, if the termination were for reasons of pure inefficiency, assuming such a general reason could be given, in which case it would be at least

arguable that a hearing would serve no useful purpose and that judgments of this kind are best left to the discretion of administrative officials. This is not such a case, however, since Kennedy was terminated on specific charges of misconduct."

certainly satisfied by the hearing afforded before the trial judge. The requirement in *Arnett* v. *Kennedy* of a hearing at "some time" is clearly met.

See, also, *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), where the Court stated:

 \* \* \* Further, with the Tucker Act remedy, the payment of "fair and equitable consideration" in compliance with the reorganization statutes is assured, and procedural due process is satisfied.

Accordingly, and without reaching the possible impact of the doctrine of laches on plaintiff's claim, it is concluded that she is not entitled to recover, and that the petition should be dismissed.

SKELTON, *Judge,* (concurring):

I concur in the decision of the court for the sole reason that under our rules our panel cannot overrule the *en banc* decision of the court in *Scroggins* v. *United States,* 397 F.2d 295, 184 Ct.Cl. 530, *cert. denied,* 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968) in which the court held that in an involuntary retirement case where physical disability is the basis for the retirement, the retired employee is not entitled to a hearing at any stage of the proceedings.

Were it not for our rule aforesaid, I would dissent on the ground that the plaintiff was entitled to a hearing before her involuntary retirement became final because of the later decision of the Supreme Court in *Arnett* v. *Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), and other similar cases. In that case the Supreme Court held that a government job was property that could not be taken away from an employee without a hearing at some stage of the proceedings because of the due process clause of the Constitution. While it is true that case involved the discharge of an employee for cause and not retirement for disability, I think the same basic rules should apply and that a hearing is required by the due process clause in both instances. See also the following decisions of the Supreme Court in which the Court held that where property is taken from a citizen the due process clause requires a hearing: *Connell* v. *Higginbotham,* 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971) (loss of a state job); *Goldberg* v. *Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (loss of welfare payments); *Morrissey* v. *Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (revocation of a parole); *Wolff* v. *McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (cancellation of a prisoner's good-time credits); *Bell* v. *Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 68 (1971) (cancellation of a driver's license); *Board of Regents* v. *Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (damaged reputation and standing); *Sniadach* v. *Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (garnishment of wages); *Fuentes* v. *Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (seizure of mortgaged property); and *Goss* v. *Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (suspension of school children).

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.