# LINDAHL *v.* OFFICE OF PERSONNEL MANAGEMENT

No. 83–5954.   Argued December 3, 1984—Decided March 20, 1985

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. WHITE, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST and O'CONNOR, JJ., joined, *post*, p. 800.

*John Murcko*, by appointment of the Court, 469 U. S. 811, argued the cause and filed briefs for petitioner.

*Edwin S. Kneedler* argued the cause for respondent. With him on the brief were *Solicitor General Lee, Acting Assistant Attorney General Willard, Deputy Solicitor General Geller, David M. Cohen, William G. Kanter,* and *Robert A. Reutershan.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union by *Burt Neuborne;* for the American Federation of

JUSTICE BRENNAN delivered the opinion of the Court.

The Office of Personnel Management (OPM) "determine[s] questions of disability and dependency" in administering the Federal Government's provision of annuities to retired employees and their dependents. 5 U. S. C. § 8347(c). Subject to administrative review by the Merit Systems Protection Board (MSPB), § 8347(d)(1), OPM's "decisions . . . concerning these matters are final and conclusive and are not subject to review," § 8347(c). This case presents two questions of substantial importance to the administration of the Government's retirement annuity program. The first is whether § 8347(c) bars judicial review altogether of an MSPB judgment affirming the denial by OPM of a disability retirement claim, or bars review only of *factual* determinations while permitting review for alleged errors of law and procedure. If judicial review is available to the latter, limited extent, a second question arises: whether the United States Court of Appeals for the Federal Circuit has jurisdiction directly to review MSPB decisions in such cases, or whether an applicant whose appeal is rejected by the MSPB must instead file a Tucker Act claim in the United States Claims Court or a United States district court, from which an appeal could then be taken to the Federal Circuit.

## I

## A

These questions implicate a host of overlapping statutory schemes, which we review before turning to the case at hand.

*The Civil Service Retirement Act (Retirement Act).*[1] Government employees who are covered by the Retirement

---

Government Employees, AFL–CIO, by *Stuart A. Kirsch* and *Mark D. Roth;* and for the National Association of Retired Federal Employees by *Irving Kator, Joseph B. Scott, James H. Heller, and Michael J. Kator.*

Briefs of *amici curiae* were filed for Willard Bronger et al. by *Max G. Brittain, Jr.;* and for Margaret Cheeseman et al. by *Edith U. Fierst.*

[1] Ch. 95, 41 Stat. 614, as amended, 5 U. S. C. § 8301 *et seq.*

Act are required to contribute a portion of their salaries to the Civil Service Retirement and Disability Fund. 5 U. S. C. §§ 8334(a), (b). The amount of retirement annuity is based on the employee's average pay and years of federal service. § 8339. The Retirement Act provides for several types of annuities; at issue here are disability retirement annuities. Pursuant to § 8337, a covered employee who has completed at least five years of federal civilian service is eligible for an immediate annuity if found "disabled," whether he is retired on his own application ("voluntary" retirement) or on the application of his employing agency ("involuntary" retirement). § 8337(a).[2]

Although the Retirement Act at no time has contained a general judicial review provision, this Court concluded almost 50 years ago that a retired employee may secure judicial review of an agency denial of his annuity claim by invoking the district courts' Tucker Act jurisdiction to entertain monetary claims against the United States. *Dismuke* v. *United States*, 297 U. S. 167 (1936). The Court reasoned:

"[I]n the absence of compelling language, resort to the courts to assert a right which the statute creates will be deemed to be curtailed only so far as authority to decide is given to the administrative officer. . . . If he is authorized to determine questions of fact his decision must be accepted unless he exceeds his authority by making a determination which is arbitrary or capricious or unsupported by evidence . . . , or by failing to follow a procedure which satisfies elementary standards of fairness and reasonableness essential to the due conduct of the

---

[2] An employee is "disabled" within the meaning of the Retirement Act if he is "unable, because of disease or injury, to render useful and efficient service in [his] position and is not qualified for reassignment . . . to a vacant position which is in the agency at the same grade or level and in which [he] would be able to render useful and efficient service." 5 U. S. C. § 8337(a).

proceeding which Congress has authorized . . . ." *Id.*, at 172.

The civil service laws later were amended to incorporate a finality provision limiting judicial review of dependency and disability determinations. See ch. 84, § 12(d) (3), 62 Stat. 56. As originally enacted, the finality provision provided:

> "Questions of dependency and disability arising under this section shall be determined by the Civil Service Commission and its decisions *with respect to such matters* shall be final and conclusive and shall not be subject to review. The Commission may order or direct at any time such medical or other examinations as it shall deem necessary *to determine the facts* relative to the nature and degree of disability . . . ." *Ibid.* (emphasis added).

This provision has undergone several revisions since 1948;[3] as now codified at 5 U. S. C. § 8347(c), the relevant language provides that determinations "concerning these matters are final and conclusive and are not subject to review."

*The Civil Service Reform Act of 1978 (CSRA).*[4] This legislation comprehensively overhauled the civil service system. Several of the CSRA's provisions bear on this case. First, Congress abolished the Civil Service Commission and created the OPM, which is now responsible for administering the Retirement Act. CSRA §§ 201, 906, 92 Stat. 1118, 1224; see 5 U. S. C. § 8347(a). Second, Congress created the MSPB, and directed that one of the Board's duties would be to

---

[3] The finality language originally applied only to survivorship benefits, but was extended to disability retirement claims by the Civil Service Retirement Act Amendments of 1956, § 401, 70 Stat. 743; the only relevant legislative history states that "[t]he bill makes no change in the existing general administrative provisions." S. Rep. No. 2642, 84th Cong., 2d Sess., 13 (1956). Subsequent amendments prior to 1980, see *infra*, at 774–775, were solely of a technical nature.

[4] Pub. L. 95–454, 92 Stat. 1111 *et seq.*

review OPM's decisions in Retirement Act cases "under procedures prescribed by the Board." CSRA § 906, 92 Stat. 1225; see 5 U. S. C. § 8347(d)(1). Third, Congress created a new framework for evaluating adverse personnel actions against "employees" and "applicants for employment": it established exacting standards for review of such actions by the MSPB, provided that "employees" and "applicants for employment" could obtain judicial review of MSPB decisions, and specified the standards for judicial review of such actions. CSRA § 205, 92 Stat. 1138, 5 U. S. C. §§ 7701, 7703 (1976 ed., Supp. V).[5] Finally, Congress provided generally that jurisdiction over "a final order or final decision of the Board" would be in the Court of Claims, pursuant to the Tucker Act, or in the regional courts of appeals, pursuant to 28 U. S. C. § 2342. See CSRA § 205, 92 Stat. 1143, 5 U. S. C. § 7703(b)(1) (1976 ed., Supp. V).

*Public Law 96–500 ("the 1980 amendment").* Congress revisited the finality language of 5 U. S. C. § 8347 in 1980, and enacted legislation providing that one subclass of Retirement Act applicants would enjoy the enhanced administrative and judicial review provisions of the recently enacted CSRA:

"In the case of any individual found by [OPM] to be disabled in whole or in part on the basis of the individual's mental condition, and that finding was made pursuant to an application by an agency for purposes of disability retirement under section 8337(a) of this title, the [MSPB review] procedures under section 7701 of this title shall

---

[5] In the MSPB review proceeding, the appellant is entitled to an evidentiary hearing, to a transcript, and to the presence of an attorney or other representative. Attorney's fees may be awarded in certain circumstances. The agency generally bears the burden of proving by a preponderance of the evidence that its decision was correct. 5 U. S. C. §§ 7701(a), (c), (g). A court may set aside the MSPB's decision if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without following applicable procedures; or "unsupported by substantial evidence" in the record. § 7703(c).

apply and the decision of the Board shall be subject to judicial review under section 7703 of this title." Pub. L. 96–500, 94 Stat. 2696, as codified in 5 U. S. C. § 8347(d)(2).

*The Federal Courts Improvement Act of 1982 (FCIA).*[6] In the FCIA, Congress combined the appellate portions of the Court of Claims' Tucker Act jurisdiction with certain elements of the regional courts of appeals' jurisdiction, and vested jurisdiction over these matters in a new United States Court of Appeals for the Federal Circuit. FCIA § 127, 96 Stat. 37, 28 U. S. C. § 1295. Whereas the Court of Claims and the regional courts of appeals formerly shared jurisdiction over appeals from the MSPB, the Federal Circuit now has exclusive jurisdiction "of an appeal from a final order or final decision" of the Board pursuant to, *inter alia*, 5 U. S. C. § 7703(b)(1). 28 U. S. C. § 1295(a)(9); see FCIA § 144, 96 Stat. 45.

B

Until his retirement, the petitioner Wayne Lindahl served as a civilian security guard at the Mare Island Naval Shipyard in Vallejo, Cal. Lindahl suffers from acute and chronic bronchitis, allegedly aggravated in part by his exposure over the years to chemical irritants at Mare Island. In September 1979, the Department of the Navy informed Lindahl that he would be retired "because your physical condition has disabled you to such an extent that you are unable to perform the full range of duties required of your position as a Police Officer." App. 10. Lindahl agreed with the Navy's assessment and chose not to contest his separation.

Both before and after his retirement, Lindahl took steps to apply for a disability retirement annuity.[7] OPM denied

---

[6] Pub. L. 97–164, 96 Stat. 25 *et seq.*

[7] The day after the Navy informed Lindahl of his impending retirement, he submitted a physician's statement to the Navy on a form that is used to accompany an application for retirement benefits, 1 MSPB Record 83–84,

Lindahl's claim several months after he had been retired on the ground that the evidence "fails to establish that you have a disability severe enough to prevent useful, efficient, and safe performance of the essential duties of the position from which you are seeking retirement." *Id.*, at 21. Pursuant to 5 U. S. C. § 8347(d), Lindahl appealed this decision to the MSPB. The Board sustained OPM's denial, finding that Lindahl had not demonstrated by a preponderance of the evidence that he was disabled within the meaning of the Retirement Act. App. 40.[8]

Lindahl then filed a complaint in the Court of Claims, invoking that court's jurisdiction under 5 U. S. C. § 7703 and the Tucker Act, 28 U. S. C. § 1491. App. 42–44. He charged that the MSPB had violated the CSRA and MSPB regulations by placing the burden of proving disability on him rather than requiring the agency to disprove disability. ¶ 14, App. 43.[9] He also alleged that the Navy had dismissed him while he was attempting to obtain disability retirement benefits, in violation of regulations requiring an agency that initiates a disability retirement action to retain the employee pending OPM's resolution of the employee's disability status.

---

but he did not file a formal application with the OPM until four days after his removal became final, App. 17–19.

[8] The Board also stated that "a conclusion by the agency that an employee is not fit to continue satisfactory duty performance is not dispositive of the issue of whether he is totally disabled under 5 U. S. C. 8331(6) so as to be eligible for a disability annuity under 5 U. S. C. 8337 from OPM." *Id.*, at 34.

[9] Lindahl argued that, since the Navy instituted the retirement action against him, the adverse action procedures set forth in 5 U. S. C. § 7701 required that the OPM demonstrate by a preponderance of the evidence that he was disabled. § 7701(c)(1)(B). Lindahl similarly contended that MSPB's regulations were properly interpreted to place the burden of proof on the OPM. See 5 CFR §§ 1201.3(a)(6), 1201.56(a) (1984). Cf. *Chavez* v. *OPM*, 6 M. S. P. B. 343, 348–349 (1981) (appeals in retirement cases are subject to § 7701 procedures).

¶ 16, App. 44.[10] After Congress enacted the FCIA in 1982, Lindahl's case was transferred to the Federal Circuit. The OPM moved to dismiss, arguing in the alternative (1) that judicial review of legal and procedural questions, as well as of factual determinations, is altogether barred in Retirement Act cases by 5 U. S. C. § 8347(c); and (2) that the jurisdictional provisions of § 7703 are limited to "employees," that retired employees are no longer "employees," and that the Federal Circuit therefore lacks direct jurisdiction of appeals from MSPB decisions in Retirement Act cases. The MSPB intervened as an *amicus curiae* in support of Lindahl's reviewability and jurisdictional contentions.

The Federal Circuit sitting en banc dismissed Lindahl's appeal as barred by § 8347(c). 718 F. 2d 391 (1983). The court concluded that the plain words of the subsection, along with the structure of the civil service laws and the import of the 1980 amendment, overcome the usual presumption favoring judicial review of administrative action. The court acknowledged that courts for almost 30 years had interpreted § 8347(c) to permit judicial review of alleged legal and procedural errors, but concluded that "those cases . . . would have to be viewed as wrongly decided and overruled." *Id.*, at 396. The court also rejected Lindahl's argument that the legislative history of the 1980 amendment indicated Congress' intention to preserve limited judicial review in Retire-

---

[10] Lindahl claimed that, since the Navy had initiated his separation on grounds of his disability, see App. 10–15, it was required under applicable personnel regulations to retain him in an active-duty status pending decision by the OPM on the Navy's proposed disability separation. See FPM Supplement 831–1, Subch. S10–10(a)(6) (1978), reprinted in App. to Brief for Petitioner 22a. We express no views on the merits of Lindahl's allegations or his construction of the pertinent statutes and regulations.

Lindahl's complaint also alleged that the disability denial was not supported by substantial evidence. ¶ 15, App. 43. Lindahl has not pursued this allegation on appeal, and in any event it is barred by 5 U. S. C. § 8347(c).

ment Act cases. Two judges filed qualified concurring opinions. *Id.*, at 400 (Nichols, J.), 405 (Nies, J.). Four others dissented, arguing, *inter alia*, that the legislative history of the 1980 amendment demonstrates Congress' awareness of the previous judicial construction of § 8347(c) and its intention to preserve judicial review to the extent previously recognized. *Id.*, at 405 (Davis, J., joined by Friedman, Kashiwa, and Smith, JJ.), 407 (Smith, J., joined by Friedman, Davis, and Kashiwa, JJ.).[11]

We granted certiorari. 467 U. S. 1251 (1984). We reverse.

## II

We have often noted that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 141 (1967). See also *Dunlop* v. *Bachowski*, 421 U. S. 560, 568 (1975). The Court previously has applied just such a presumption in Retirement Act cases, albeit prior to the enactment of § 8347(c). See *Dismuke* v. *United States*, 297 U. S., at 172 (judicial review presumed available "in the absence of compelling [statutory] language" to the contrary). Of course, the "clear and convincing evidence" standard has never turned on a talismanic

---

[11] Prior to the FCIA's vesting of review over MSPB decisions in the Federal Circuit, the regional Courts of Appeals had divided over the effect of the 1980 amendment on the proper construction of § 8347(c). Some had held that the amended § 8347 continues only to bar factual scrutiny of disability determinations while permitting review for legal and procedural errors. See, *e. g., Pitzak* v. *OPM*, 710 F. 2d 1476, 1478–1479 (CA10 1983); *Turner* v. *OPM*, 228 U. S. App. D. C. 94, 97–99, 707 F. 2d 1499, 1502–1504 (1983); *McCard* v. *MSPB*, 702 F. 2d 978, 980–983 (CA11 1983); *Parodi* v. *MSPB*, 702 F. 2d 743, 745–748 (CA9 1982). Others had held that it altogether bars review. See, *e. g., Chase* v. *Director, OPM*, 695 F. 2d 790, 791 (CA4 1982); *Campbell* v. *OPM*, 694 F. 2d 305, 307–308 (CA3 1982); *Morgan* v. *OPM*, 675 F. 2d 196, 198–201 (CA8 1982). But see *Lancellotti* v. *OPM*, 704 F. 2d 91, 96–98 (CA3 1983) (reading § 8347(c) to permit review for alleged legal error, and grounding jurisdiction on 28 U. S. C. § 2342(6) (1976 ed., Supp. V)).

test. *Block* v. *Community Nutrition Institute*, 467 U. S. 340, 345–346 (1984). Rather, the question whether a statute precludes judicial review "is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.*, at 345.

The Federal Circuit reasoned that § 8347(c), except as qualified by § 8347(d)(2), plainly precludes any judicial review of OPM decisions in voluntary disability retirement cases: "[i]t is difficult to conceive of a more clear-cut statement of congressional intent to preclude review than one in which the concept of finality is thrice repeated in a single sentence." 718 F. 2d, at 393. We do not share the Federal Circuit's certainty with respect to the plain import of the statutory language. To begin with, while § 8347(c) plausibly can be read as imposing an absolute bar to judicial review, it also quite naturally can be read as precluding review only of OPM's *factual* determinations about "questions of disability and dependency." Under this reading of § 8347(c)'s language, the factual "question" whether an applicant is disabled is quite distinct from questions of what laws and procedures the OPM must apply in administering the Retirement Act.[12] In addition, the application of § 8347(c) as completely preclusive is problematic when a disability applicant, as here, challenges not only OPM's determinations but also the standards and procedures used by the MSPB in reviewing those determinations. Section 8347(c) speaks of the preclusive effect of OPM determinations, but says nothing one way or the other about the finality of MSPB judgments. Finally, our hesitation regarding the "plain meaning" of § 8347(c) is compounded by the fact that, when Congress intends to bar

---

[12] This reading is reinforced by the third sentence of § 8347(c), which provides that the OPM may take appropriate steps "to determine the facts concerning disability or dependency of an individual." The juxtaposition of the finality language with the language concerning OPM's determinations of "the facts" of disability arguably suggests that the finality language does not extend to procedural or legal questions.

judicial review altogether, it typically employs language far more unambiguous and comprehensive than that set forth in § 8347.[13]   Congress' failure to use similar language in § 8347(c) therefore reinforces the possibility that the finality bar may extend only to OPM's *factual* determinations "with respect to" disability and dependency questions.

Until Congress' 1980 amendment of § 8347, this was precisely the interpretation adopted by courts in reviewing disability retirement decisions by the OPM and its predecessor, the Civil Service Commission.   Under the *"Scroggins"* standard, so-called after *Scroggins* v. *United States*, 184 Ct. Cl. 530, 397 F. 2d 295, cert. denied, 393 U. S. 952 (1968), courts acknowledged that § 8347(c) imposes "a special and unusual restriction on judicial examination, and under it courts are not as free to review Commission retirement decisions as they would be if the 'finality' clause were not there."   184 Ct. Cl., at 533–534, 397 F. 2d, at 297.   Accordingly, courts emphasized that they could not weigh the evidence or even apply the traditional substantial-evidence standard for reviewing disability determinations.   *Id.*, at 534, 397 F. 2d, at 297.   Courts also held, however, that § 8347(c)'s finality language did not prevent them from reviewing Commission decisions to determine whether there had been "'a substantial departure from important procedural rights, a misconstruc-

---

[13] See, *e. g.*, 5 U. S. C. § 8128(b) (compensation for work injuries) ("The action of the Secretary [of Labor] or his designee in allowing or denying a payment under this subchapter is—(1) final and conclusive for all purposes and with respect to all questions of law and fact; and (2) not subject to review by another official of the United States or by a court by mandamus or otherwise").   See also 38 U. S. C. § 211(a) (veterans' benefits) ("[T]he decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans and their dependents or survivors shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise").

tion of the governing legislation, or some like error "going to the heart of the administrative determination." ' " *Ibid.*[14]

The Federal Circuit nevertheless believed that Congress' revision of § 8347 in 1980 "provide[s] compelling evidence of its intent to preclude judicial review of MSPB decisions on voluntary disability retirement claims." 718 F. 2d, at 394. Again employing a "plain words" analysis, the court reasoned that the addition of § 8347(d)(2)—providing for MSPB review of involuntary mental disability retirement decisions pursuant to the standards of § 7701 and for judicial review of such decisions pursuant to the standards of § 7703—demonstrates that Congress intended all other types of disability retirement decisions to be unreviewable. "To hold that judicial review of all § 8347(d)(1) decisions had all along been available under § 7703, would be to render superfluous Congress' action in § 8347(d)(2), making judicial review available for particular claims under § 7703." *Id.*, at 399.

Again we cannot agree that the meaning of the 1980 amendment is "plain" on its face. The *Scroggins* standard allows only for review of legal and procedural errors. The 1980 amendment added § 8347(d)(2), which provides special safeguards in cases of involuntary mental disability retirements. That subsection incorporates § 7703, which provides,

---

[14] See also *Fitzgerald* v. *United States*, 224 Ct. Cl. 215, 220, 623 F. 2d 696, 699 (1980); *Polos* v. *United States*, 223 Ct. Cl. 547, 559–560, n. 9, 621 F. 2d 385, 391, n. 9 (1980); *Fancher* v. *United States*, 218 Ct. Cl. 504, 509–510, 588 F. 2d 803, 806 (1978); *Allen* v. *United States*, 215 Ct. Cl. 524, 529–530, 571 F. 2d 14, 17–18 (1978), overruled on other grounds, *Polos* v. *United States, supra; McFarland* v. *United States*, 207 Ct. Cl. 38, 46–47, 517 F. 2d 938, 942–943 (1975), cert. denied, 423 U. S. 1049 (1976); *Lech* v. *United States*, 187 Ct. Cl. 471, 476, 409 F. 2d 252, 255 (1969); *McGlasson* v. *United States*, 184 Ct. Cl. 542, 548–549, 397 F. 2d 303, 307 (1968); *Gaines* v. *United States*, 158 Ct. Cl. 497, 502, cert. denied, 371 U. S. 936 (1962); *Smith* v. *Dulles*, 99 U. S. App. D. C. 6, 9, 236 F. 2d 739, 742, cert. denied, 352 U. S. 955 (1956); *Matricciana* v. *Hampton*, 416 F. Supp. 288, 289 (Md. 1976); *Cantrell* v. *United States*, 240 F. Supp. 851, 853 (WDSC 1965), aff'd, 356 F. 2d 915 (CA4 1966).

*inter alia,* for a substantial-evidence standard of review of the factual bases of OPM's decisions. Given the much more deferential *Scroggins* standard of review, there would be nothing "superfluous" about an amendment providing for the full measure of judicial review pursuant to § 7703 in one subclass of retirement cases. There is certainly nothing on the face of the 1980 amendment suggesting that Congress intended to discard *Scroggins* review generally while expanding upon it in a particular category of cases. Absent more compelling indicia of congressional intent—whether from the overall statutory structure or from the legislative history— we thus believe in these circumstances that " '[t]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others.' " *Abbott Laboratories* v. *Gardner,* 387 U. S., at 141 (citation omitted).

Moreover, the fact that Congress amended § 8347 in 1980 without explicitly repealing the established *Scroggins* doctrine itself gives rise to a presumption that Congress intended to embody *Scroggins* in the amended version of § 8347.[15] We need not rely on the bare force of this presumption here, however, because the legislative history of the 1980 amendment demonstrates that Congress was indeed well aware of the *Scroggins* standard, amended § 8347 on its understanding that *Scroggins* applied to judicial review of

---

[15] "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change, see *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 414 n. 8 (1975); *NLRB* v. *Gullett Gin Co.,* 340 U. S. 361, 366 (1951); *National Lead Co.* v. *United States,* 252 U. S. 140, 147 (1920); 2A C. Sands, Sutherland on Statutory Construction § 49.09 and cases cited (4th ed. 1973). So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard* v. *Pons,* 434 U. S. 575, 580–581 (1978). See also *Bob Jones University* v. *United States,* 461 U. S. 574, 601–602 (1983); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran,* 456 U. S. 353, 381–382 (1982).

disability retirement decisions generally, and intended that *Scroggins* review continue except to the extent augmented by the more exacting standards of § 8347(d)(2).

The 1980 amendment to § 8347 grew out of investigations and oversight hearings conducted by the Subcommittee on Compensation and Employee Benefits of the House Committee on Post Office and Civil Service. In a 1978 Report, the Subcommittee found that several Government agencies had used involuntary mental disability retirements as a disciplinary tool against unpopular employees and that the finality language of § 8347(c) had worked a "devastating effect" on the ability of courts to scrutinize the evidentiary underpinnings of such dismissals. Forced Retirement/Psychiatric Fitness for Duty Exams, 95th Cong., 2d Sess., 15 (Comm. Print 1978) (Subcommittee Report). The Subcommittee emphasized its understanding that § 8347(c) did not "eliminate the constitutional right of appeal of the courts in the case of official 'arbitrary and capricious conduct.'" *Ibid.* Citing numerous Court of Claims cases, including *Scroggins*, the Subcommittee stated that under the judicial construction of § 8347(c) a retired employee could obtain judicial relief if he could "show one of the three following conditions: there has been a substantial departure from important procedural rights, a misconstruction of governing legislation, and an error going to the heart of the administrative determinations." Subcommittee Report, at 15.[16] The Subcommittee criticized this construction "as imposing an almost impossible heavy burden of proof" on retired employees, *ibid.*, and accordingly called for the outright repeal of the preclusion language of § 8347(c), *id.*, at 20.

These recommendations were embodied in legislation introduced the following year by Representative Spellman, the

---

[16] The Subcommittee analyzed three Court of Claims cases: *Gaines* v. *United States, supra; McGlasson* v. *United States, supra;* and *Scroggins* v. *United States,* 184 Ct. Cl. 530, 397 F. 2d 295, cert. denied, 393 U. S. 952 (1968). See Subcommittee Report, at 15. See also *id.*, at 19–20.

Subcommittee's Chair. H. R. 2510, 96th Cong., 1st Sess. (1979). In hearings on the proposed bill, representatives from OPM noted that outright repeal of § 8347(c)'s finality provision would result in full judicial review of all OPM disability and dependency decisions, and objected that such broad review was unwarranted and *unnecessary:* under § 8347(c) as it had long been interpreted,

> "if there are questions of proper procedure or constitutional issues, these questions may be raised in the Federal court system. Only the questions *[sic]* of disability itself, which is a question of medical fact, is actually barred from judicial review by section 8347(c).
> 
> "We believe that these protections are adequate. . . . The courts already may review questions of procedure as distinguished from questions of fact concerning the disability itself, and employees are, therefore, not entirely precluded from obtaining judicial review." Hearing on H. R. 2510 before the Subcommittee on Compensation and Employee Benefits of the House Committee on Post Office and Civil Service, 96th Cong., 1st Sess., 4 (1979) (Subcommittee Hearing) (statement of Gary Nelson, Associate Director, Compensation Group, OPM).

Thereafter, the full Committee adopted an amendment in the nature of a substitute to H. R. 2510 that limited full judicial review "to cases involving agency-filed applications for disability retirement based on an employee's mental condition." H. R. Rep. No. 96–1080, p. 2 (1980). The Director of OPM, Alan K. Campbell, then wrote the Chairman of the Committee to inform him that, in light of the elimination of the "sweeping" judicial review originally proposed, OPM was now prepared to support the measure:

> "We believe that it is reasonable and proper to restrict *expanded* judicial review to involuntary disability retirements. An employee who voluntarily applies for disability retirement seeks to establish title to a benefit

granted by law; the Office of Personnel Management is the administrative agency charged under the law with the managerial function of adjudicating disability retirement claims. It is appropriate, therefore, that OPM decisions on voluntary applications be conclusive, *reviewable only to determine whether there has been a substantial procedural error, misconstruction of governing legislation, or some like error going to the heart of the administrative determination.*" Letter from Alan K. Campbell to Rep. James M. Hanley (May 14, 1980), reprinted in H. R. Rep. No. 96–1080, at 8 (emphasis added).[17]

Director Campbell made these identical representations to the Chairman of the Senate Committee on Governmental Affairs, see Letter from Alan K. Campbell to Sen. Abraham A. Ribicoff (Sept. 25, 1980), reprinted in S. Rep. No. 96–1004, pp. 4–5 (1980); his letter was cited in the Senate Report as providing "further reinforce[ment]" for and an "endorsement" of the Committee's position on the proper scope of the amendment, *id.*, at 3.

Notwithstanding that this history strongly suggests that Congress restricted the scope of its revision of § 8347 precisely on the understanding that limited judicial review already was available in disability retirement cases, the respondent seizes upon isolated passages in the legislative history in support of its argument that Congress *in fact* was under the impression in 1980 that § 8347(c) barred review

---

[17] OPM continued to oppose provisions in H. R. 2510 that would have provided for *de novo* district court review of MSPB decisions in cases involving involuntary mental disability retirements. See Letter from Alan K. Campbell to Rep. James M. Hanley (May 14, 1980), reprinted in H. R. Rep. No. 96–1080, p. 8 (1980). The Senate Committee on Governmental Affairs successfully proposed that the bill be amended to provide for review in the Court of Claims or the regional courts of appeals pursuant to the standards of 5 U. S. C. § 7703. See S. Rep. No. 96–1004, pp. 2–3 (1980). See generally *infra*, at 798–799, and n. 36.

altogether. See also *post,* at 804–808 (WHITE, J., dissenting). There were, to be sure, references throughout the legislative proceedings to the "present bar to judicial review of disability determinations"; [18] the purpose of the amendment frequently was characterized as being "to remove the ban to judicial review of certain disability retirement determinations." [19] These assertions, however, typically were supported by detailed analyses of and quotations from the *Scroggins* line of cases. [20] Because these cases hold that the "bar" extends only to review of the *factual* elements of disability determinations, statements in which *Scroggins* was cited cannot serve to indicate that Congress believed there was an *absolute* bar to judicial review. Rather, the conclusion was that "*expanded* judicial review [of] involuntary disability retirements" was necessary under the provisions of 5 U. S. C. § 7703. [21] The *Scroggins* standard, it was contended, was "so narrow" that it prevented effective judicial review; "a more thorough review would reveal the evidentiary weakness" of many involuntary mental disability retirements. [22]

---

[18] See, *e. g.,* H. R. Rep. No. 96–1080, at 3.

[19] See, *e. g.,* S. Rep. No. 96–1004, at 1. See also Subcommittee Report, at 1; Subcommittee Hearing, at 4, 11; H. R. Rep. No. 96–1080, at 2–4; S. Rep. No. 96–1004, at 3–4; 126 Cong. Rec. 14815– 14817 (1980) (remarks of Reps. Spellman, Rudd, and Corcoran).

[20] See, *e. g.,* Subcommittee Report, at 14–16, 19–20; Subcommittee Hearing, at 11–12, 20–21, 28; H. R. Rep. No. 96–1080, at 4. See also Subcommittee Report, at 15; Subcommittee Hearing, at 4; H. R. Rep. No. 96–1080, at 8; S. Rep. No. 96–1004, at 4–5; 126 Cong. Rec. 14817–14818 (1980) (Letter from OPM Director Campbell to Rep. James M. Hanley (May 14, 1980), inserted by Rep. Derwinski) (all discussing availability of review for legal and procedural errors).

[21] H. R. Rep. No. 96–1080, at 3.

[22] Subcommittee Report, at 20; Subcommittee Hearing, at 28 (prepared statement of National Federation of Federal Employees).

Largely tracking the respondent's arguments, the dissent consists almost entirely of a patchwork of isolated words and phrases wrenched out of context. At times the dissent's demands appear circular: it dismisses out-

If Congress had intended by the 1980 amendment not only to expand judicial review in mental disability cases beyond the established *Scroggins* standard but to abolish the standard in all other cases as well, there would presumably be some indication in the legislative history to this effect. There is none. Nor, despite Congress' explicit consideration of the *Scroggins* interpretation of § 8347, did Congress amend the wording of the finality clause other than to provide for more expansive review in mental disability cases. "Given that the sole purpose of the amendment was to expand judicial protection of employees through review of factual findings in a certain subset of cases, it hardly follows that Congress negatively implied its intent to strip employees of *Scroggins*-type review in other cases." *Turner* v. *OPM*, 228 U. S. App. D. C. 94, 98, 707 F. 2d 1499, 1503 (1983).

The Federal Circuit nevertheless concluded that the references to *Scroggins* were made by only "some congressmen,"

right all references to *Scroggins* in the legislative history on the ground that Congress might not have understood *Scroggins* "as a decision holding review available"; in virtually the same breath, it rejects all references to the availability of limited judicial review on the ground that *those* references "nowhere mentio[n] *Scroggins*." *Post*, at 805, n. 4, 808.

The dissent also points to statements during floor debates to the effect that federal employees lacked "access to the courts" and that OPM wished to limit the amendment to "[p]rocedural review," reasoning that if "[p]rocedural review" already was available the amendment "would have made little or no sense." *Post*, at 806, n. 5, 806. As discussed in text, the legislative history as a whole demonstrates that the desired "access" concerned access for *evidentiary* review. See *supra*, at 783–786. Similarly, it was made quite clear during the floor debates that OPM's proposed "[p]rocedural review" would consist of appellate scrutiny on a substantial-evidence basis—which was not available under *Scroggins* and thus not superfluous. See, *e. g.*, 126 Cong. Rec. 14816–14817 (1980) (remarks of Rep. Corcoran). The House rejected OPM's alternative and instead called for full *de novo* review of disability findings; the Senate successfully proposed to eliminate *de novo* review in favor of the substantial-evidence standard. See n. 36, *infra*.

and that the "comments of a few congressmen" are unreliable indicia of congressional intent. 718 F. 2d, at 399–400. The *Scroggins* standard was discussed, not just by "a few congressmen," but by the sponsor of the legislation, the Subcommittee from which it originated, and the House and Senate Committees responsible for its consideration. Similarly, it is contended that the testimony and correspondence of OPM Director Campbell and other agency officials "could not express the intent of Congress." *Id.*, at 399; see also Brief for Respondent 48–49. Yet while Congress' understanding of the enactment is of course our touchstone, in discerning what it was that Congress understood "we necessarily attach 'great weight' to agency representations to Congress when the administrators 'participated in drafting and directly made known their views to Congress in committee hearings.'" *United States* v. *Vogel Fertilizer Co.*, 455 U. S. 16, 31 (1982), quoting *Zuber* v. *Allen*, 396 U. S. 168, 192 (1969). Here the Director and other representatives of OPM described the *Scroggins* standard in detail to both responsible Committees, and relied on the existence of that standard in successfully proposing narrower alternatives to the proposed legislation.[23]

_____

[23] The dissent would sweep aside this entire legislative history on the basis of some random statements taken out of context. Notwithstanding that the Subcommittee Report spelled out the current availability of *Scroggins* review, for example, the dissent seizes upon one statement by the Subcommittee's Associate Counsel expressing skepticism of OPM's position, and it concludes that the Subcommittee thereby "changed its position on the effect of § 8347(c)" after issuing the Report. *Post*, at 809; see also *post*, at 807. The dissent omits to mention that, during the same testimony, the Associate Counsel *also* (1) observed that under the subsection "'courts are *not as free to review Commission retirement decisions* as they would be if the finality clause were not there,'" (2) criticized the subsection as "*so confining* that even in a case like *[Scroggins]* the employee could not be sustained," and (3) complained that under the *Scroggins* doctrine "people *went to court* in . . . *an almost impossible legal situation.*" Subcommittee Hearing, at 11–12, 18 (emphasis added), quoting *McFarland* v. *United States*, 207 Ct. Cl., at 46, 517 F. 2d, at 942. It is difficult, to say the least, to square such testimony with the dissent's view that it demonstrates Congress' belief that § 8347(c) stood as an "*absolute* preclusion of

The Federal Circuit also reasoned, however, that most of the *Scroggins* line of cases involved involuntary retirements for alleged mental disabilities, and that none was addressed to voluntary disability retirement claims. 718 F. 2d, at 395. The *Scroggins* standard was never restricted solely to involuntary mental disability retirements,[24] however, and the legislative history quite clearly indicates that Congress' understanding was that the *Scroggins* standard applied to disability retirement claims generally.[25]

Finally, it is suggested that prior to 1980 the *Scroggins* standard was little more than ill-considered dicta in that (1) it "had resulted in virtually no reversals of the decisions reached in the administrative process," 718 F. 2d, at 399; (2) courts invoking *Scroggins* had never "consider[ed] the matter in any depth," Brief for Respondent 42; and (3) the *Scroggins*

---

judicial review"—let alone that the Subcommittee "changed its position on the effect of § 8347(c)." *Post,* at 804, 809 (emphasis added).

Similarly, the dissent dismisses the relevance of OPM's repeated assurances that limited review already was available and Congress' narrowing of the amendment in response to these representations. The dissent thinks it unclear whether OPM's references were to *"judicial* review at all," reasoning that "for all that appears" the agency's assurances "may have been referring to the review of OPM decisions available in the MSPB." *Post,* at 808–809. This reasoning is curious given that OPM's representations (1) separately discussed the availability of full *de novo* review from the MSPB, and (2) were *explicitly* addressed to the questions of whether and to what extent *"judicial* review" should be "expanded" beyond current practice. See, *e. g.,* Letter from Alan K. Campbell to Rep. James M. Hanley (May 14, 1980), reprinted in H. R. Rep. No. 96–1080, at 8 (emphasis added).

[24] Courts had exercised *Scroggins* review in several physical disability cases. See, *e. g., Polos* v. *United States,* 223 Ct. Cl., at 558–563, 621 F. 2d, at 390–393; *Allen* v. *United States,* 215 Ct. Cl., at 529–533, 571 F. 2d, at 17–19; *Lech* v. *United States,* 187 Ct. Cl., at 476, 409 F. 2d, at 255. Moreover, courts had never cast the *Scroggins* standard in terms of the circumstances of the retirement claim, but rather in terms of judicial authority under the Retirement Act to exercise limited review over disability retirement claims generally. See n. 14, *supra.*

[25] See, *e. g.,* Subcommittee Report, at 15; Subcommittee Hearing, at 4; H. R. Rep. No. 96–1080, at 8; S. Rep. No. 96–1004, at 4–5; 126 Cong. Rec. 14817–14818 (1980).

standard was wrong from the outset and "[w]hat did not properly exist cannot be expanded," 718 F. 2d, at 399. See also *post,* at 802, n. 2 (WHITE, J., dissenting) ("The so-called *Scroggins* doctrine apparently is the product of frequent repetition of the *Scroggins* court's dictum"). Each of these assertions is either erroneous or misses the mark. That courts applying *Scroggins* had almost never reversed agency decisions is a testament to *Scroggins'* narrow compass, not to its insubstantiality.[26] A fair reading of the cases demonstrates that the courts carefully articulated the standard to begin with, and reaffirmed its vitality only after measured reconsideration.[27] And whether or not *Scroggins* was correctly decided is largely inapposite to the question at hand. "For the relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was." *Brown* v. *GSA,* 425 U. S. 820, 828 (1976).[28]

---

[26] Courts did not advance the standard as dicta, but instead invoked it as authority for exercising jurisdiction to review agency decisions in disability retirement cases. After conducting such review, courts almost always concluded that the alleged error of law or procedure did not warrant reversal. See cases cited in n. 14, *supra.* But see *Polos* v. *United States, supra,* at 564–565, 621 F. 2d, at 391–392 (remanding case to OPM after finding errors of law); *Allen* v. *United States, supra,* at 533, 571 F. 2d, at 19 (reversing Civil Service Commission denial of annuity).

[27] See cases cited in n. 14, *supra.* Prior to the 1980 amendment, the Government had argued before the Court of Claims that *Scroggins* was erroneously decided, but after further consideration the court rejected the Government's contention and reaffirmed the *Scroggins* interpretation of § 8347(c). *Fancher* v. *United States,* 218 Ct. Cl., at 510, n. 3, 588 F. 2d, at 806, n. 3.

[28] The reliance by the respondent and the dissent on *United States* v. *Erika, Inc.,* 456 U. S. 201 (1982), is inapposite. See *post,* at 801, n. 1. *Erika* held that the Medicare statute bars judicial review of certain administrative decisions concerning reimbursement to health care providers. Although there was no explicit statutory bar to judicial review of such decisions, we concluded that "[i]n the context of the statute's precisely drawn provisions" the omission of a review provision "provides persuasive

The Federal Circuit therefore erred in concluding that § 8347, as amended, altogether bars judicial review of MSPB decisions in retirement disability cases. Accordingly, while the factual underpinnings of § 8347 disability determinations may not be judicially reviewed, such review is available to determine whether "there has been a substantial departure from important procedural rights, a misconstruction of the governing legislation, or some like error 'going to the heart of the administrative determination.'" *Scroggins* v. *United States*, 184 Ct. Cl., at 534, 397 F. 2d, at 297.

## III

The respondent contends that, even if *Scroggins* review is available, the Court of Appeals for the Federal Circuit has no jurisdiction directly to review MSPB disability retirement decisions except as provided in § 8347(d)(2). Instead, the respondent argues, retirees such as Lindahl whose administrative appeals are rejected by the MSPB must file a Tucker Act suit in a district court pursuant to 28 U. S. C. § 1346(a)(2) or in the Claims Court pursuant to 28 U. S. C. § 1491(a), after which the judgment can be appealed to the Federal Circuit pursuant to 28 U. S. C. § 1295(a)(2) or (a)(3), respectively. In other words, the respondent contends that most retirees may not obtain direct Federal Circuit review of MSPB decisions, but must instead surmount a two-step judicial review process—with a trial court initially conducting the nonevidentiary *Scroggins* review, followed by the Federal Circuit conducting the identical review all over again.

---

evidence that Congress deliberately intended to foreclose further review of such claims." 456 U. S., at 208. The instant case, on the other hand, involves an ambiguous preclusion provision and the interplay of several statutes that are hardly "precise." See *infra*, at 793–794. More significantly, we found in *Erika* that the legislative history "confirm[ed]" Congress' intent absolutely to preclude review and "explain[ed] its logic." 456 U. S., at 208. In this case, on the other hand, the legislative history compels exactly the opposite conclusion.

In addition to making no apparent sense as a matter of sound judicial administration, this argument does not accord with the jurisdictional framework established by the CSRA and the FCIA. Title 28 U. S. C. § 1295(a) provides: "The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction . . . (9) of an appeal from a final order or final decision of the Merit Systems Protection Board, pursuant to sections 7703(b)(1) and 7703(d) of title 5." Title 5 U. S. C. § 7703(b)(1) in turn provides that, except for discrimination cases covered by subsection (b)(2), "a petition to review *a final order or final decision of the Board* shall be filed in the United States Court of Appeals for the Federal Circuit" (emphasis added).[29] Sections 1295(a)(9) and 7703(b)(1) together appear to provide for exclusive jurisdiction over MSPB decisions in the Federal Circuit, and do not admit any exceptions for disability retirement claims.

The respondent argues, however, that § 7703(b)(1) can only properly be understood by reference to § 7703(a)(1), which provides that "[a]ny employee or applicant for employment" may obtain judicial review of MSPB decisions and orders. Contending that former employees are not "employees" within the meaning of § 7703(a)(1), the respondent advances two grounds in support of its argument that the jurisdictional grant of § 7703(b)(1) is limited to appeals authorized by § 7703(a)(1). First, it seems to assert that § 7703(a)(1) is *itself* the operative jurisdictional grant, because it repeatedly contends that § 7703(b)(1) "appears to be nothing more than a venue provision." Brief for Respondent 22; see also *id.*, at 29. This argument wholly misperceives the statutory

---

[29] Title 5 U. S. C. § 7703(b)(2) provides that cases of discrimination shall be filed in either a district court or the Claims Court, depending on which antidiscrimination statute is at issue; the plaintiff is guaranteed the right to a *de novo* trial in such cases, § 7703(c). Section 7703(d), the other jurisdictional provision referred to in 28 U. S. C. § 1295(a)(9), provides that a petition by the Director of the OPM to review an adverse MSPB decision may be filed in the Federal Circuit, and sets forth the circumstances in which the Director may seek such review.

framework. Section 7703(a)(1) creates a right of review for "employee[s]" and "applicant[s] for employment," but is not addressed to subject-matter jurisdiction at all. Section 7703(b)(1) confers the operative grant of jurisdiction—the "power to adjudicate"—and is not in any sense a "venue" provision.[30] The fact that § 7703(a)(1) provides one action for review under the jurisdiction of § 7703(b)(1) does not preclude the possibility of other actions for review that similarly would fall within the jurisdictional perimeters of § 7703(b)(1).

Second, the respondent contends that the CSRA, which initially enacted § 7703(b)(1), was addressed primarily to adverse actions against employees and applicants for employment and that Congress did not intend, in either the CSRA or the FCIA, to extend the direct review mechanism beyond MSPB decisions involving such matters. There is no question that Congress' primary focus in the CSRA was on adverse actions, and there are numerous references throughout the legislative history to § 7703 as a mechanism for review of adverse actions.[31] These legislative references, combined with the proximity of § 7703(a)(1) and § 7703(b)(1), might be read as limiting the latter to the terms of the former. But as numerous lower courts have noted, "[i]n the process of drafting a comprehensive scheme of reform Congress failed to address specifically how the mechanics of the [CSRA] would function in certain situations," and the judicial task therefore is to "'look to the provisions of the whole law,

---

[30] Venue provisions come into play only after jurisdiction has been established and concern "the place where judicial authority may be exercised"; rather than relating to the power of a court, venue "relates to the convenience of litigants and as such is subject to their disposition." *Neirbo Co.* v. *Bethlehem Shipbuilding Corp.*, 308 U. S. 165, 168 (1939). Compare, *e. g.*, 28 U. S. C. § 1331 (grant of general federal-question jurisdiction to district courts) with § 1391 (venue for exercise of such jurisdiction). See generally 15 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3801 (1976).

[31] See, *e. g.*, S. Rep. No. 95–969, pp. 62–63 (1978); H. R. Rep. No. 95–1403, pp. 22–23 (1978).

and to its object and policy.'" *Meyer* v. *Department of HHS*, 229 Ct. Cl. 151, 153–154, 666 F. 2d 540, 542 (1981), quoting *Richards* v. *United States*, 369 U. S. 1, 11 (1962). When construing these arguably ambiguous provisions, our duty is "to remain faithful to the central congressional purposes underlying the enactment of the CSRA." *Devine* v. *White*, 225 U. S. App. D. C. 179, 183, 697 F. 2d 421, 425 (1983). A review of the policies and purposes of the CSRA and FCIA demonstrates that the terms of § 7703(b)(1) and 28 U. S. C. § 1295(a)(9) should not be limited by an implied jurisdictional restriction for disability retirement cases.

As originally enacted by Congress in the CSRA, § 7703(b)(1) provided that jurisdiction over appeals from MSPB final decisions would rest either in the Court of Claims, pursuant to the Tucker Act, or in the regional courts of appeals, pursuant to 28 U. S. C. § 2342(6) (1976 ed., Supp. V). See 5 U. S. C. § 7703(b)(1) (1976 ed., Supp. V). The House version of the bill had provided for jurisdiction in either the Court of Claims or the district courts, but the Conference Committee substituted review in the courts of appeals because it believed "the traditional appellate mechanism for reviewing final decisions and orders of Federal administrative agencies" would best promote efficient review of MSPB actions. H. R. Conf. Rep. No. 95–1717, p. 143 (1978). See also S. Rep. No. 95–969, p. 62 (1978). And although most of the detailed discussion of judicial review was addressed to adverse actions, it was emphasized that § 7703(b)(1)'s "traditional appellate mechanism" would apply to "adverse actions, such as removals, *and other appealable actions taken by an agency.*" *Id.*, at 51 (emphasis added). Section 7703 was described as governing "judicial review of *all* final orders or decisions of the Board." *Id.*, at 62.[32] Moreover, the Senate

---

[32] See also S. Rep. No. 95–969, at 29 ("Action by the Merit Systems Protection Board, following any hearing or adjudication *on any matter falling within its jurisdiction,* constitutes final agency action for the purposes of judicial review") (emphasis added).

Report explicitly identified certain nonadverse action appeals that would not be encompassed by § 7703(b)(1); it emphasized, for example, that "Board decisions and orders (other than those involving discrimination complaints and *determinations concerning life and health insurance*) [shall] be reviewable" under the jurisdiction conferred by that subsection. *Id.*, at 63 (emphasis added). Life and health insurance cases are not adverse action matters, and they continue to be reviewed under separate jurisdictional grants set forth at 5 U. S. C. § 8715 and § 8912. We believe the inference is strong, given that disability retirement decisions were not included in this enumeration of exceptions, that Congress did not intend for such decisions to fall outside the all-encompassing provisions of § 7703(b)(1).

In the FCIA, Congress amended § 7703(b)(1) to combine portions of the jurisdiction of the Court of Claims and the regional courts of appeals into one centralized court, the Court of Appeals for the Federal Circuit. The Court of Claims previously had exercised its jurisdiction under 28 U. S. C. § 1491 both as an appellate tribunal and as a trial court.[33] As explained by the Senate Report, the purpose of the FCIA was to consolidate the "government claims case[s] and all other *appellate matters* that are now considered by

[33] From 1925 until the Court of Claims was abolished by the FCIA, the court's trial function was performed by a "Trial Division" consisting of commissioners appointed by the Court of Claims Article III judges; in any matter requiring *de novo* factfinding a commissioner presided over the trial and made findings of fact and recommendations of law which were then reviewed by the "Appellate Division," consisting of the judges themselves. In those matters not requiring factfinding, a case typically was routed directly to a panel of the court, which conducted review comparable to that of an appellate court. For further discussion of this bifurcation, see Cowen, Nichols, & Bennett, The United States Court of Claims: A History, Part II, pp. 90–95, 131–133 (1978, published in 216 Ct. Cl.); Bar Association of the District of Columbia, Manual for Practice in the United States Court of Claims 5–8, 71–73 (1976); H. R. Rep. No. 97–312, p. 24 (1981); S. Rep. No. 97–275, pp. 7–8 (1981).

the . . . Court of Claims" pursuant to its § 1491 Tucker Act jurisdiction with civil service appeals considered by the regional courts of appeals. S. Rep. No. 97–275, p. 6 (1981) (emphasis added). The result, both Houses emphasized, would be that the new Federal Circuit would have "jurisdiction of *any* appeal from a final order or final decision of the Merit Systems Protection Board." *Id.*, at 21 (emphasis added). See also H. R. Rep. No. 97–312, p. 18 (1981) (Federal Circuit to have jurisdiction "over all appeals from the Merit Systems Protection Board").

The FCIA also created a new Claims Court that would continue to exercise general Tucker Act jurisdiction; that court would "inheri[t]" the Court of Claims' "trial jurisdiction" under § 1491. S. Rep. No. 97–275, at 7; H. R. Rep. No. 97–312, at 24. With the exception of changing the name of the relevant court, however, Congress did not amend the language of § 1491, under which the Court of Claims previously had exercised both trial and appellate functions. The result is that the appellate jurisdiction of the new Federal Circuit appears to overlap with the residuary trial jurisdiction of the Claims Court. For example, although neither party has addressed the import of this language, there remains in § 1491(a)(2) an explicit reference to the Claims Court's authority to "issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records." Similarly, the legislative history of the FCIA contains references to military and civilian pay disputes being channeled to the Federal Circuit, see H. R. Rep. No. 97–312, at 19; S. Rep. No. 97–275, at 6, as well as to such disputes remaining as part of the Claims Court's jurisdiction, H. R. Rep. No. 97–312, at 24.

In light of this ambiguity and the apparent jurisdictional overlap, we must resort to a functional analysis of the role of these different courts and to a consideration of Congress' broader purposes. See *supra*, at 793–794. It seems clear to us that Congress in the FCIA intended to channel those

Tucker Act cases in which the Court of Claims performed an appellate function—such as traditional review of agency action based on the agency record—into the Federal Circuit, and to leave cases requiring *de novo* factfinding in the Claims Court and district courts.[34]   Congress in the CSRA had explicitly provided for the "traditional appellate mechanism" for review of MSPB decisions, H. R. Conf. Rep. No. 95–1717, at 143, and we have interpreted similar jurisdictional grants precisely so as to carry out Congress' intent to promote the "sound polic[ies]" of placing agency review in the courts of appeals.  *Florida Power & Light Co.* v. *Lorion, ante,* at 745; see also *Harrison* v. *PPG Industries, Inc.,* 446 U. S. 578, 593 (1980).   Review of an MSPB order involving a disability retirement claim not only is explicitly encompassed in the Federal Circuit's jurisdiction, but also makes logical sense given that the court considers only legal and procedural questions and does not review the factual bases of the administrative decision.

A contrary conclusion would result in exactly the sort of "duplicative, wasteful and inefficient" judicial review that Congress in the CSRA and the FCIA intended to eradicate.[35]   The CSRA and the FCIA quite clearly demonstrate

---

[34] This functional bifurcation of the Court of Claims' Tucker Act jurisdiction was repeatedly emphasized.   See, *e. g.,* H. R. Rep. No. 97–312, at 17–19, 24 ("[T]he Claims Court essentially will have the same jurisdiction that the Court of Claims now exercises through its Trial Division under the Tucker Act, 28 U. S. C. § 1491, together with the authority to enter final judgment"); S. Rep. No. 97–275, at 2 (Claims Court the "new article I trial forum"), 22.

[35] Vaughn, Civil Service Discipline and Application of the Civil Service Reform Act of 1978, 1982 Utah L. Rev. 339, 369.   The two-stage process of reviewing personnel actions first in a trial court and then in an appellate court, with both courts employing the same standards in reviewing the administrative record, had been criticized as "serv[ing] no visible purpose," contributing to "over-crowded dockets in all courts," and impeding the ability of courts "to give, efficiently and expeditiously, the most appropriate kind of relief." *Adams* v. *Laird,* 136 U. S. App. D. C. 388, 392, n. 2, 420 F. 2d 230, 234, n. 2 (1969), cert. denied, 397 U. S. 1039 (1970); *Scott*

that Congress intended to abolish the needless practice of reviewing civil service actions on the same criteria at two judicial levels. The Senate Report on the FCIA, for example, emphasized that direct appeal to the Federal Circuit would "improv[e] the administration of the [judicial] system by reducing the number of decision-making entities." S. Rep. No. 97–275, at 3. Similarly, the Senate Report on the CSRA emphasized that trial-level review of agency action was "appropriate" only where "additional fact-finding" was necessary, and that in all other cases direct appellate review would "merely eliminat[e] an unnecessary layer of judicial review." S. Rep. No. 95–969, at 52, 63.

The respondent has skillfully parsed the legislative history and culled every possible nuance and ambiguity, but it has failed to advance a single argument why Congress would have intended to depart from the plain jurisdictional language in cases of disability retirement appeals and to require instead that such appeals be reviewed for legal and procedural error first by the Claims Court or a district court, and then all over again by the Federal Circuit. That Congress could not have intended such a wasteful exercise is reinforced by § 8347(d)(2), which explicitly provides that one subclass of disability retirement cases—those involving involuntary dismissals based on an individual's alleged mental disability— are appealable directly from the MSPB to the Federal Circuit.[36] We can discern no reason why Congress would have

---

v. *Macy*, 131 U. S. App. D. C. 93, 96, n. 6, 402 F. 2d 644, 647, n. 6 (1968); *Connelly* v. *Nitze*, 130 U. S. App. D. C. 351, 352, n. 1, 401 F. 2d 416, 417, n. 1 (1968). See also R. Vaughn, Principles of Civil Service Law § 5.4(1) (1976) (discussing uncertain and overlapping jurisdictional bases for judicial review of civil service matters); Johnson & Stoll, Judicial Review of Federal Employee Dismissals and Other Adverse Actions, 57 Cornell L. Rev. 178, 188–197 (1972); Vaughn, The Opinions of the Merit Systems Protection Board: A Study in Administrative Adjudication, 34 Admin. L. Rev. 25, 29, nn. 29–30 (1982); Developments in the Law—Public Employment, 97 Harv. L. Rev. 1611, 1642–1643 (1984).

[36] The original House version of the 1980 amendment had provided for review of MSPB decisions in such cases by the district courts or the Court

intended that mental disability cases, which permit for evidentiary review, be channeled to an appellate forum, while intending that other retirement cases, which permit only for *Scroggins* review, be channeled to a trial forum for nonevidentiary review and then to the Federal Circuit for performance of the identical review. Moreover, as Judge Nichols suggested in his concurrence below, 718 F. 2d, at 400, there frequently will be disputes—as in this case—as to whether an employee's retirement was involuntary or voluntary, and accordingly as to whether the appeal might properly be characterized as an adverse action rather than as a simple disability retirement matter. See n. 38, *infra*. In the absence of any indication in the legislative history or persuasive functional argument to the contrary, we cannot assume that Congress intended to create such a bizarre jurisdictional patchwork.[37] Accordingly, we conclude that MSPB decisions concerning retirement disability claims are reviewable in the first instance by the Federal Circuit pursuant to the jurisdictional grants in 5 U. S. C. § 7703(b)(1) and 28 U. S. C. § 1295(a)(9).[38]

---

of Claims. The Senate Committee on Governmental Affairs successfully proposed to amend the legislation to incorporate the traditional appellate review model, reasoning that "[s]ince full de novo review is now provided before the Merit Systems Protection Board, it would be cumbersome and inappropriate to provide for a second de novo review in the United States district court." S. Rep. No. 96–1004, at 3.

[37] Cf. *Crown Simpson Pulp Co.* v. *Costle*, 445 U. S. 193, 197 (1980) ("Absent a far clearer expression of congressional intent, we are unwilling to read the Act as creating such a seemingly irrational bifurcated system").

[38] Lindahl and various *amici* have argued that a retired federal employee should be considered in at least some circumstances to be an "employee" within the meaning of 5 U. S. C. § 7701 and § 7703(a)(1), and accordingly offer additional jurisdictional analyses based on the asserted applicability of these provisions. The respondent has devoted much of its briefing to an effort at demonstrating that §§ 7701 and 7703(a)(1) do not apply "to *any* retirement actions." Brief for Respondent 24 (emphasis in original). The Federal Circuit in *Bronger* v. *OPM*, 740 F. 2d 1552, 1554–1556 (1984), has held that a retired employee filing for an annuity may in at least some circumstances be considered an "employee" within the meaning of

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, with whom THE CHIEF JUSTICE, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, dissenting.

Title 5 U. S. C. § 8347(c) states:

> "The Office [of Personnel Management] shall determine questions of disability and dependency arising under this subchapter. Except to the extent provided under subsection (d) of this section, the decisions of the Office concerning these matters are final and conclusive and are not subject to review."

The majority concedes that in cases like petitioner's, subsection (d) of 5 U. S. C. § 8347 provides only for review of OPM's decisions by the Merit Systems Protection Board (MSPB). Nonetheless, the majority concludes that notwithstanding the review preclusion provision of § 8347(c), petitioner is entitled to judicial review of the denial of his claim for disability retirement benefits. In the view of the majority, § 8347(c) must be interpreted to preclude judicial review only of OPM's factual determinations, not of questions of law. Because I consider the exercise in statutory construction that supports this conclusion fundamentally unsound, I dissent.

The majority begins by asserting that the language of the statute is ambiguous, as it "quite naturally can be read as precluding review only of OPM's *factual* determinations

---

§ 7703(a)(1). See also *Chavez* v. *OPM*, 6 M. S. P. B., at 348 (retired employee considered an "employee" for purposes of § 7701 administrative review procedures over OPM disability retirement denial). Our resolution of the instant case does not require that we consider whether and under what circumstances a retired employee filing for a disability annuity may ever be considered an "employee" for purposes of § 7701 or § 7703(a)(1), and we express no views on that issue.

about 'questions of disability and dependency.'" *Ante,* at 779. With all due respect, I confess that I cannot understand how one can "quite naturally" read a provision precluding review of *decisions* concerning "questions of disability . . . arising under this subchapter" to apply only to *factual findings* of disability. Had Congress intended to preclude review only of factual findings, it seems unlikely that it would have employed the much more comprehensive term "decisions." The statute strikes me as ambiguous only in the sense that any statement may be termed "ambiguous" on the theory that the utterer may have meant something other than what he said. Such a nihilistic view of linguistic interpretation may be fashionable in some circles, but it hardly provides an adequate basis for statutory construction. A more conventional reading of the statute—one that takes as its starting point the plain meaning of the statutory language—would leave little alternative to rejecting petitioner's argument that OPM's denial of his claim for disability benefits is judicially reviewable.[1]

Having declared the statute's language ambiguous, however, the majority seeks to bolster its interpretation through resort to the legislative history. The legislative history relied upon, however, is not that of the Congress that originally enacted the preclusion provision, for that history, as the majority concedes, provides no hint that the statute does not mean what it says. Instead, the majority examines the legislative history of the 1980 amendments to § 8347, which

---

[1] The majority suggests that Congress ordinarily is more explicit when it seeks to preclude review altogether. *Ante,* at 779–780. But this argument was ruled out by our decision in *United States* v. *Erika, Inc.,* 456 U. S. 201 (1982), in which we held that preclusion of review could be inferred from Congress' failure to provide explicitly for review. The majority attempts to distinguish *Erika* on the ground that Congress' *silence* in the statute under consideration there was less ambiguous than its affirmative preclusion of review in the statute at issue here. *Ante,* at 790–791, n. 28. Such argumentation is, to put it mildly, unconvincing.

802

created an exception to § 8347(c)'s preclusion of judicial review—an exception limited to involuntary mental disability cases. One would normally believe that by creating an express exception to the rule precluding judicial review while maintaining the bar to review in all other cases, Congress would have underscored rather than undermined the force of § 8347(c). The contrary contention is that in "revisiting" § 8347, Congress implicitly ratified the so-called *Scroggins* doctrine, under which disability determinations of the OPM and its predecessor, the Civil Service Commission, were held by the Court of Claims to be reviewable for procedural error notwithstanding § 8347(c).[2] In relying on this history, the majority purports to be applying the canon of statutory construction articulated in *Lorillard* v. *Pons,* 434 U. S. 575 (1978):

"Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change . . . . So too, where . . . Congress adopts a new law incorporating sections of a prior law, Congress nor-

[2] *Scroggins* v. *United States,* 184 Ct. Cl. 530, 397 F. 2d 295, cert. denied, 393 U. S. 952 (1968), is an unlikely source for the doctrine that disability decisions are reviewable. In *Scroggins,* the Court of Claims stated that under § 8347(c), *"at best,* a court can set aside the Commission's determination 'only where there has been a substantial departure from important procedural rights, a misconstruction of the governing legislation, or some like error "going to the heart of the administrative determination." ' " *Id.,* at 534, 397 F. 2d, at 297 (emphasis added). The court went on to hold that it had no power to overturn the Civil Service Commission's decision to retire an employee against his will on mental disability grounds notwithstanding that the decision lacked any evidentiary support. The so-called *Scroggins* doctrine apparently is the product of frequent repetition of the *Scroggins* court's dictum regarding the circumstances under which it might have the power to review a disability decision. As the majority points out, reversal under the *Scroggins* formula was, at least as of 1980, virtually unheard of. See *ante,* at 790, and n. 26.

mally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Id.*, at 580–581.

Of course, neither *Lorillard* nor the authorities it cites are directly relevant here, for Congress did not "re-enact" the review preclusion in the 1980 legislation, nor did it "incorporate" the language of § 8347(c) in a new statute; rather, it left § 8347(c) intact and created a specific new exception to its preclusion of review. In creating this exception, which was designed solely as a remedy for the perceived problem of misuse by federal agencies of involuntary mental disability retirement proceedings to rid themselves of unpopular employees, Congress can hardly be said to have "adopted" any interpretation of the preclusion provision that it left untouched. Even if Congress was aware of the construction placed upon § 8347(c) by the Court of Claims, its inaction in the face of that construction is an unsatisfactory basis on which to rest the majority's interpretation of the statute. See, *e. g., Aaron* v. *SEC*, 446 U. S. 680, 694, n. 11 (1980).[3]

---

[3] Faced with a question of the proper construction of § 10(b) of the Securities Exchange Act of 1934, the Court in *Aaron* rejected a line of argument almost identical to that which it accepts today:

"The Commission finds further support for its interpretation . . . in the fact that Congress was expressly informed of the Commission's interpretation on two occasions when significant amendments to the securities laws were enacted . . . and on each occasion Congress left the administrative interpretation undisturbed. . . . But, since the legislative consideration of those statutes was addressed principally to matters other than that at issue here, it is our view that the failure of Congress to overturn the Commission's interpretation falls far short of providing a basis to support a construction of § 10(b) so clearly at odds with its plain meaning and legislative history." 446 U. S., at 694, n. 11.

I do not suggest that Congress' inaction in the face of an authoritative statutory interpretation brought to its attention is never probative of the proper interpretation of the statute. In *Bob Jones University* v. *United States*, 461 U. S. 574 (1983), for example, the Court based its acceptance of

There is no basis in the legislative history for concluding that Congress endorsed *Scroggins* review in cases subject to § 8347(c): that history indicates with reasonable clarity that Congress believed that the exception it was creating in § 8347(d)(2) was an exception to an otherwise absolute preclusion of judicial review. The Committee Reports describing the legislation amending § 8347 nowhere indicate any congressional recognition of the possibility that under § 8347 as it then existed, limited judicial review of OPM's disability decisions might be available. The House Report speaks in categorical terms of § 8347(c)'s "bar to judicial review," H. R. Rep. No. 96–1080, p. 3 (1980), while the Senate Report refers to the "bar to any review of OPM's decisions on disability," S. Rep. No. 96–1004, p. 3 (1980). And although, as the majority points out, the House Report does contain a discussion of the *Scroggins* decision and of two other Court of Claims decisions that the majority classes as following *Scroggins,* the Report's discussion evinces no belief that *Scroggins* permits any form of judicial review. Rather, the Report excoriates *Scroggins* and its progeny as extreme examples of the pernicious effects of precluding judicial review of involuntary mental disability retirement cases.[4] The Committee Reports

---

the Internal Revenue Service's interpretation of § 501(c)(3) of the Internal Revenue Code in part on Congress' failure to repudiate that interpretation. The Court emphasized, however, that its decision to rely on legislative nonaction as a guide to the statute's meaning was justified because of Congress' "prolonged and acute awareness" of the IRS interpretation, which had been brought to Congress' attention by legislation designed to overturn it at least 13 times in the space of a dozen years. *Id.,* at 600–601. The Court cautioned that "[o]rdinarily, and quite appropriately, courts are slow to attribute significance to the failure of Congress to act on particular legislation." *Id.,* at 600.

[4] The House Report stated:

"Under present law disability determinations are not subject to review (*see,* 5 U. S. C. 8347(c)). The committee was made aware of the adverse effect of this bar to judicial review by two Court of Claims decisions issued on June 14, 1968, in two psychiatric disability retirement cases. These cases were *McGlasson* v. *United States,* 397 F. 2d 303 (1968), and

thus represent a different interpretation of *Scroggins* than that offered by the majority; they by no means suggest that anyone in Congress believed that in leaving the § 8347(c) bar to review intact in all cases other than involuntary mental disability retirement cases, Congress would be endorsing the view that § 8347(c) permitted limited judicial review in all of those other cases.

The discussion on the House floor of the bill amending § 8347 provides a further indication that Congress did not believe § 8347(c) permitted any judicial review at all in cases to which it applied. Representative Spellman, who chaired the Committee that reported the bill, explained that the provision allowing judicial review of involuntary mental disability retirement cases was necessary because "MSPB's decision in these cases currently are *[sic]* final and not subject to court review." 126 Cong. Rec. 14815 (1980).[5] The follow-

---

*Scroggins* v. *United States*, 397 F. 2d 295 (1968)." H. R. Rep. No. 96–1080, at 4.

The majority suggests that because *Scroggins* and its progeny in fact held that limited judicial review was available under § 8347(c), "statements in which *Scroggins* was cited cannot serve to indicate that Congress believed there was an *absolute* bar to judicial review." *Ante*, at 786. The fallacy in this argument is obvious: it assumes that Congress read *Scroggins* the same way the majority reads it today. The Committee Report, however, indicates that this assumption is unwarranted: in its Report to the full House, the Committee presented the *Scroggins* decision as an instance of the preclusion of review, not as a decision holding review available. That this may not have been an entirely accurate view of *Scroggins* is of course irrelevant, for under the majority's approach to the interpretation of this statute, "the relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was." *Brown* v. *GSA*, 425 U. S. 820, 828 (1976), quoted *ante*, at 790. In any event, the Committee's apparent interpretation of *Scroggins* as a review preclusion case rather than a case actually establishing the existence of a form of judicial review is by no means unwarranted. See n. 2, *supra*.

[5] Representative Spellman, in her prepared statement explaining the purpose of the bill, also remarked that "OPM would support H. R. 2510 if the judicial review were limited to procedural questions involving these

ing colloquy then took place between Representative Spellman and Representative Rudd:

"Mr. RUDD: Mr. Speaker, I would simply like to ask a couple of questions of the gentlewoman from Maryland about this legislation.

"I think recourse to the courts is always available for wrongs that have been committed, but apparently this makes it a little easier for a judicial review of an employee-employer relationship decision. Is that correct?

.     .     .     .     .

"Mrs. SPELLMAN: I would like to explain to the gentleman from Arizona that unfortunately access to the courts is not available to these employees at this time.

"Mr. RUDD: My question is that this legislation would expedite it, so to speak?

"Mrs. SPELLMAN: Exactly. The gentleman is absolutely right.

"Mr. RUDD: With the understanding that the courts are always available for wrongs that have been committed, for equity, for justice, with this addition to the legislation, would that be in the way of an intimidation to the employer, a Federal employer?

"Mrs. SPELLMAN: No; I guess I did not make it clear. For employees today who are asked to take fitness-for-duty exams and are found to be unfit for duty, even based upon a telephone call with a psychiatrist, they do not have access to the courts. The law precludes them from having that access today. What we are attempting to do is treat them like citizens of the

---

disability decisions rather than questions of both procedure and the medical facts of the case." 126 Cong. Rec. 14816 (1980). Procedural review, of course, is precisely what the majority contends was already available despite § 8347(c). Representative Spellman's remark, however, would have made little or no sense if she had shared this view.

United States of America should be treated, opening up that review by the court." *Id.*, at 14817.

Representative Spellman's status as the Chairman of the Committee that authored the amendments to § 8347 gives her explanation of what those amendments were intended to accomplish some authority. See, *e. g., Train* v. *Colorado Public Interest Research Group*, 426 U. S. 1, 14–17 (1976); *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 475 (1921). Her remarks on the floor are unequivocal indications that those who wrote the bill amending § 8347 perceived it to create an exception to an otherwise unqualified bar to judicial review. Spellman's explanation of the bill substantially undermines the plausibility of the majority's conclusion that in leaving the § 8347(c) bar in place for all cases other than involuntary mental disability cases Congress believed it was leaving open the possibility of limited judicial review in cases to which § 8347(c) applied.

The majority insists that Congress believed limited review to be available under § 8347(c) because OPM told it that that was the case. This conclusion in large part is based on the testimony of an OPM representative before the House Subcommittee that initially drafted the legislation that, as amended, ultimately emerged as the bill amending § 8347. The OPM representative informed the members of the Subcommittee that judicial review for procedural error was not barred by § 8347(c). What the majority fails to mention is that this testimony was immediately followed by a statement from the Subcommittee's own Associate Counsel, who stated:

"It is the subcommittee position that litigation is necessary even though the previous witness talked about employees not needing any further access to the courts because procedural issues are already taken up on a due process basis by the courts without any special legislation.

"This is a fairly decent theory except the Court of Claims doesn't agree." Hearing on H. R. 2510 et al. before the Subcommittee on Compensation and Employee Benefits of the House Committee on Post Office and Civil Service, 96th Cong., 1st Sess., 11 (1979) (statement of Thomas R. Kennedy, Associate Counsel, Subcommittee on Investigations).

The witness then proceeded to provide his own analysis of the *Scroggins* line of cases, the gist of which was that § 8347(c) effectively barred any judicial review of OPM's disability decisions. The Subcommittee hearings thus provide a slim basis for the notion that Congress believed that limited review was permitted by § 8347(c)—indeed, to the extent that the hearings suggest anything, it is that Congress believed § 8347(c) meant just what it said.

The majority also places heavy emphasis on two letters written by the Director of OPM to the House and Senate Committees considering the amendments to § 8347. Each letter contains the statement that OPM believed that "[i]t is appropriate . . . that OPM decisions on voluntary applications be conclusive, reviewable only to determine whether there has been a substantial procedural error, misconstruction of governing legislation, or some like error going to the heart of the administrative determination." Letter from Alan K. Campbell to Rep. James M. Hanley (May 14, 1980), reprinted in H. R. Rep. No. 96–1080, p. 8 (1980); Letter from Alan K. Campbell to Sen. Abraham A. Ribicoff (Sept. 25, 1980), reprinted in S. Rep. No. 96–1004, p. 4 (1980). Because this language tracks the description of judicial review under the so-called *Scroggins* formula, the majority urges that these letters put Congress on notice that such review was permitted under § 8347(c). But the Campbell letters nowhere mention *Scroggins* or state that what Campbell believed to be appropriate was in fact the law. Nor, indeed, do the letters indicate that the limited form of review Campbell believed appropriate in voluntary disability cases was *judicial* review at all: for all that appears, the letters may have

been referring to the review of OPM decisions available in the MSPB.[6] The oblique reference to review of voluntary disability claims in the Campbell letters is insufficient to establish that Congress believed that its passage of the amendments to § 8347 constituted an endorsement of *Scroggins* review.

The only evidence the majority can point to that suggests that anyone in or connected with Congress believed in the existence of *Scroggins* review is the 1978 Subcommittee Report discussed *ante*, at 783. The author of this Committee print did take the position that § 8347(c) permitted some review—albeit severely limited review—of the Civil Service Commission's disability decisions. I doubt, however, that the interpretation of § 8347(c) advanced in a 1978 Committee print can be attributed to the Congress that amended § 8347 two years later. In the intervening period, the Subcommittee's staff apparently changed its position on the effect of § 8347(c), see *supra*, at 807–808, and the Committee Reports on the bill amending § 8347—particularly when read in light of Representative Spellman's explanatory remarks on the House floor—leave the definite impression that the House and Senate Committees that reported the bill believed the bar in § 8347(c) to be absolute.

The majority's approach, then, amounts to this. A far-fetched reading of a reasonably clear statute is posited. On the strength of this "ambiguity," resort is had to the legislative history, not of the enacting Congress, but of a Congress nearly three decades later that neither re-enacted nor amended the language in question. A thorough combing of the legislative history reveals fragmentary support for the notion that Congress may have been aware of a particular

---

[6] Only a Congressman who had actually read the *Scroggins* decision and recognized Campbell's use of the language employed in that opinion would have had any basis for concluding that Campbell was alluding to the availability of *Scroggins* review. I think it is safe to assume that few Congressmen were familiar enough with the jurisprudence of the Court of Claims to recognize OPM's plagiarism.

incorrect construction placed on the statute in question in a few cases decided by the Court of Claims. Notwithstanding that the weight of the evidence is against the hypothesis that Congress was aware of this construction, it is concluded that Congress not only assumed that the courts would continue to place this construction on the statute, but also actually enacted this assumption into law when it amended the statute in another respect. Through this remarkable exercise in reconstruction of the legislative process, the Court departs from both of the fundamental principles of statutory construction: that a court's object is to give effect to the intent of the enacting legislature, and that the surest guide to the intent of the legislature is the language of the statute itself.

I do not mean to endorse the simplistic view that the words printed in the United States Code can answer all questions regarding the meaning of statutes. Resort to legislative history will always be a necessary tool of statutory construction, and the circumstances under which courts should turn to legislative history and the weight to be accorded particular sources of history cannot be prescribed by inflexible canons of construction. Statutory interpretation requires a certain amount of freedom to choose the materials best suited to illuminating the meaning of the particular provisions at hand. But when the history is less useful than the statutory language itself—when, for example, the history can serve only as a basis for debatable speculations on what some Congress other than the one that enacted the statute thought that the statute meant when it did something else—courts should resist the temptation to let their enthusiasm for reports, hearings, and committee prints lead them to neglect the comparatively unambiguous meaning of the statute itself. In this case, the majority seems to me to have fallen prey to that temptation and thereby missed the proper interpretation of the statute.

I therefore dissent.